Madden, Judge,
delivered the opinion of the court:
The plaintiff corporation sues to recover $91,145.80 of income and excess profits taxes, a part of the taxes paid by it for the year 1944. The ground for its suit is that it was denied a “dividends paid” credit or reduction of its taxable income, which reduction it claimed on account of certain payments made by it in connection with the rearrangement of the structure of its preferred stock.
The plaintiff is a public utility. Its contentions in this suit are, in part, the same as those made by Atlantic City Electric Company v. United States, this day decided, ante, p. 519. We will not repeat here the background material which is recited at length in the Atlantic City Electric Company case.
The plaintiff’s preferred stock met the qualifications prescribed in section 26 (h) of the Internal Revenue Code of 1939 to make the dividends on that stock eligible for the tax deduction provided for in that section. In 1944 it had outstanding common stock and two classes of preferred stock, one class being 7 percent stock and the other, in effect, 6 percent stock. Both classes of preferred stock were callable by the corporation at $110 per share plus accrued dividends. The corporation called the preferred stock by offering the stockholders the choice of either exchanging their stock, share for share, for new 4 percent preferred stock plus $8 per share in cash, plus accrued dividends, or surrendering their stock for $110 per share in cash, plus accrued dividends. At this time 88 percent of the preferred stock was owned by persons who did not own any common stock.
Some two thirds of the shares of preferred stock were exchanged for the new 4 percent preferred stock and the cash. The other one third were redeemed for the $110 per share in cash.
*536 As to the payments made for the redemption of preferred stock, the plaintiff’s situation is like that of the taxpayer in Atlantic City Electric Company, supra, and our conclusion is that the plaintiff’s payments were not “dividends” within the meaning of section 26 (h).
The plaintiff claims that the “boot money,” the $8 per share which was paid to the holders of the 6 percent and 7 percent shares which were exchanged for the new 4 percent stock, was a dividend within the meaning of section 26 (h) for reasons which vary somewhat from those urged in support of the claim relating to the redeemed stock. It points to section 112 (c) of the Internal Revenue Code of 1939 which says, in effect, that in an otherwise tax-free exchange of property by a corporation, in a reorganization transaction, if there is boot money paid, and if the payment “has the effect of the distribution of a taxable dividend,” then the boot money should be taxed to the distributee as a dividend, i. e., as ordinary income and not as capital gain.
It will be remembered that section 115 (c) provides that distributions in liquidation shall be treated as payments for the stock liquidated and not as taxable ordinary income. The Government argued successfully in Atlantic City Electric Company, supra, that if the payment was not a dividend received in the hands of the distributee-shareholder, it was not a dividend-paid as regards the distributor-corporation. By comparable reasoning, it would seem that, in the case of a reorganization covered by section 112 (c), if the boot payment is such that it is treated as a taxable dividend in the hands of the distributee, it should be a tax deduction for the distributor.
We consider, then, whether the $8 payment had “the effect of the distribution of a taxable dividend,” within the meaning of section 112 (c) (2). Section 115 (g) has a comparable provision for redemption situations. It says:
If a corporation cancels or redeems its stock * * * at such time and in such manner as to make the distribution and cancellation or redemption * * * essentially equivalent to the distribution of a taxable dividend * * *
the distribution shall be treated as a taxable dividend.
*537 Both of these provisions have the purpose of preventing the distribution, under the guise of a liquidation or a reorganization, of what are in effect dividends and giving the distribution the favorable tax status of a capital gain transaction.
The plaintiff says that all that is required to bring the distribution within the coverage of section 112 (c) (2) is that there should be an exchange of stock and the payment of boot money. It says that the existence of these two facts produces the legal conclusion that the boot money was a taxable dividend to the stockholder, and a tax deduction to the corporation; that the statutorily required equivalence follows, ipso facto. It urges that Commissioner v. Estate of Bedford, 325 U. S. 283, so holds.
The text of section 112 (c) seems to us to contradict the plaintiff’s contention. Paragraph (1) of the section treats of an exchange of stock which would be tax free except for the payment of boot money, and provides that if the boot money represents a gain to the shareholder, the gain should be taxable as such. Then paragraph (2), on which the plaintiff relies, provides that if the exchange would otherwise be within the provisions of paragraph (1), “but has the effect of the distribution of a taxable dividend,” then the boot money should be taxed to the distributee as a dividend, to the extent that it is paid out of earnings and profits. If Congress meant merely to say that any boot money at all paid out of earnings should be a taxable dividend, it used a verbose and complicated way of saying it.
The plaintiff says that the Supreme Court of the United States in Commissioner v. Estate of Bedford, supra, held what we are urged to hold. In that case it was quite plain that the cash payment made in connection with the exchange was made to get around a New York statute which prevented the corporation from avowedly paying a dividend. There were other circumstances indicating that the payment was the distribution of a dividend under another guise. The Court’s opinion did not emphasize the facts showing equivalence, but we do not read the decision, as the plaintiff does, as making equivalence in fact legally irrelevant.
This court, in Stein v. United States, 104 C. Cls. 446, recited the particular facts showing that the payment was *538 equivalent to a dividend, and in Smith v. United States, 131 C. Cls. 748, it recited the facts showing that the payment was not so equivalent. In Rheinstrom v. Conner, 125 F. 2d 790 (C.A. 6), the court analyzes numerous cases in which courts have determined, on the facts of each case, the question of equivalence. We think we must do so in this case.
In the litigation over the application of section 112 (c)> (2) and the comparable section 115 (g), distributee-tax-payers have sought to convince the courts that the distribution was not the equivalent of a dividend. The Government has urged the contrary. On the other hand, corporation-distributors have urged that the distributions were dividends, in order to get the tax credit granted by section 26 (h) to public utility corporations, or by section 27 to corporations charged with unreasonably accumulating surplus, and corporations whose stock is closely held. In the section 26 (h) and section 27 cases, the Government has sometimes not contested very vigorously the allowance of the dividends-paid credit to the corporation if it could be sure that the payments had been taxed to the shareholders as dividends.
The test of whether the payment is the equivalent of a dividend is the same in the case of a corporation which seeks an affirmative response as in the case of a shareholder who seeks a negative response.
In the instant case, as we have seen, the holders of the 6 and 7 percent preferred stock were given the option of redemption at $110 or exchange for 4 percent, $100 par new issue preferred stock. Some 40,000 shares were exchanged and some 20,000 redeemed. At the time of the redemption and exchange, 88 percent of the old preferred stock was owned by persons who did not own any common stock of the corporation, of which there were 450,000 shares of $20 par value outstanding. There had been authorized, but unissued, some 40,000 additional shares of preferred stock which the corporation had the power to issue at any time. In the process of reorganization the by-laws were amended so that the unissued shares could not be issued except upon a majority vote of the common stock and a majority of the preferred stock, unless certain specified conditions were met.
*539 An important indicium of equivalence of a payment to a dividend is present if, after tire exchange of stock and the payment, the shareholder still has the same or substantially the same interest in the corporation after the payment that he had before. The ordinary dividend received by a shareholder does not disturb his interest in the corporation at all. He has the right, in the future, to the same fixed rate of dividend on his preferred stock, or the same share of the profits, on his common stock, as he had before the dividend was paid. In the instant case the shareholders’ status, for the future, was drastically changed. His rate of return upon his stock was reduced from 7 percent or 6 percent to 4 percent, a reduction of 42 percent or 33y3 percent. It is not conceivable that one holding such shares in this prosperous corporation, with its preferred stock dividends all paid up to date, would have made such an exchange for a boot of $8 except under the comprdsion that otherwise his stock would be redeemed at $110. This last figure was, in fact, less than the market price of the shares had been before the redemption action was initiated.
The reorganization was for the benefit of the common stockholders who were, as we have seen, almost entirely different persons from those who held the preferred stock. In the solicitation of proxies for the stockholders’ meeting to authorize the redemption of the preferred stock, the president of the plaintiff stated that the proposed action would result in a saving to the corporation, after taxes, of $128,775 per year. The reorganization also made an important increase in the voting power of the common stock, by requiring its separate concurrence in the future issuing of the unissued shares of preferred stock.
We think that the payment of money here in question, made in the course of a reorganization which so severely reduced the interest of the shareholders in the corporation, did not have “the effect of the distribution of a taxable dividend” within the meaning of section 112 (c) (2).
The Government has raised a question as to the adequacy of the plaintiff’s claim for refund as to the redemption premium and a question as to the sufficiency of earnings and *540 profits to cover all the distributions made in 1944. Both of these questions are interesting and, probably, difficult. In view of our conclusion as to the question treated at length in the opinion, we need not resolve them.
The plaintiff’s petition will be dismissed.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OE EACT
The court, having considered the evidence, the stipulations of the parties, the briefs and arguments of counsel, makes findings of fact as follows:
1. The action arises under the Internal Revenue laws of the United States and more particularly Section 26 (h) of the Internal Revenue Code of 1939.
2. The jurisdiction of this Court is based upon Title 28, United States Code, Section 1491, in that this is a claim against the United States founded upon an Act of Congress.
3. No action upon the claim, other than as set forth in these findings, has been taken by plaintiff before the Congress or any of the departments of the United States or in any court and no assignment or transfer of said claim has been made by plaintiff.
4. At all times hereinafter mentioned plaintiff was, and now is, a corporation duly organized and existing under and by virtue of the laws of the State of Maine, and having its principal office and place of business in Boise, Idaho.
5. Plaintiff is now and in 1944 was a public utility, as defined in Section 26 (h) of the Internal Revenue Code of 1939, engaged in the sale of electric energy in the States of Idaho, Oregon and Nevada; under rates in Idaho which have been established or approved by the Idaho Public Utilities Commission; under rates in Oregon which have been approved by the Public Utilities Commission of Oregon; under rates in Nevada which have been approved by the Public Service Commission of Nevada and under rates approved by the Federal Power Commission with reference to sales of power for resale in interstate commerce.
*541 6.On or about March. 29, 1945, plaintiff, pursuant to a grant of extension of time, duly filed its Federal income tax return for the calendar year 1944 with the Collector of Internal Revenue for the District of Idaho. Net income of $2,347,849.72 for the calendar year 1944 was reported on said return which indicated an income tax liability of $582,246.96. Said income tax liability was paid to the Collector of Internal Revenue for the District of Idaho in installments as follows:
March 30, 1945_$145, 750.00
June 19, 1945_ 145,373.48
September 14, 1945_ 145, 561.74
December 17, 1945_ 145, 561.74
7.On or about March 29, 1945, plaintiff, pursuant to a grant of extension of time, filed its Federal excess profits tax return for the calendar year 1944 with the Collector of Internal Revenue for the District of Idaho. Net income of $2,347,849.72 for the calendar year 1944 was reported on said return which indicated an excess profits tax liability of $711,836.83. In said return, plaintiff claimed, and was allowed by the Commissioner of Internal Revenue in a Notice of Adjustment dated October 6, 1945, an abatement of its 1944 excess profits tax in the amount of 10%, or $71,183.68. This abatement arose as a result of the 10% credit against the excess profits tax as provided under Section 784 (a) of the Internal Revenue Code of 1939. Plaintiff’s excess profits tax liability for the year 1944, after application of such credit, amounted to $640,653.15. Said excess profits tax liability was paid to the Collector of Internal Revenue for the District of Idaho in installments as follows:
March 30, 1945_$180, 000,00
June 19, 1945_ 175,918.42
September 14, 1945_ 142,367.37
December 17, 1945- 142,367.36
8.On or about May 27,1946, plaintiff received a refund of income taxes for the year 1944 in the amount of $986.44 and a refund of excess profits taxes for the same year in the amount of $436,424.12. These refunds were allowed as a result of an Application for Tentative Carryback Adjustment filed on or about March 12, 1946 pursuant to Section *542 3779 of the Internal Eevenue Code of 1939 with respect to amortization of emergency facilities on an accelerated basis under Section 124 (d) of the Internal Eevenue Code of 1939.
9. On or about March 18, 1947, plaintiff filed with the Internal Eevenue Agent in Charge, Salt Lake City, Utah, a Waiver of Eestrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 874). In said waiver, plaintiff accepted an overassessment in income taxes for the year 1944 in the amount of $5,331.40 and consented to the assessment and collection of $15,017.73 in excess profits tax for the year.
10. On March 25, 1948, within the period of limitation prescribed by Section 322 (b)< of the Internal Eevenue Code of 1939, plaintiff filed with the Collector of Internal Eevenue for the District of Idaho a Claim for Eefund of Federal income and excess profits taxes paid for the calendar year 1944. In said claim, plaintiff demanded refund of $50,079.74 in Federal income taxes and $4,725.14 in excess profits taxes for said year. On July 7, 1953, the Commissioner of Internal Eevenue, by registered mail, sent to plaintiff a notice of disallowance of said claim.
11(a). Immediately prior to August 1,1944, plaintiff had outstanding 450,000 shares of Common Stock of a par value of $20 per share, 28,457 shares of $6 Preferred Stock and 32,130 shares of 7% Preferred Stock, both classes of Preferred Stock sometimes being referred to hereinafter as “old Preferred Stock.” Said old Preferred Stock was issued prior to October 1, 1942, and constituted preferred stock as defined in Section 26' (h) of the Internal Eevenue Code of 1939.
11(b). Immediately prior to August 1,1944, both the old Preferred Stock and the Common Stock were publicly held. One hundred and twenty-four persons or corporations owning a total of 9.248% of the Common Stock also owned, in varying proportions, 7,300 shares of the outstanding 60,587 shares of both classes of old Preferred Stock. The remaining 53,287 shares of old Preferred Stock were widely distributed among persons or corporations who did not own any Common Stock. The old Preferred Stock holdings of the one hundred and twenty-four persons or corporations re *543 ferred to above bore no consistent percentage relationship to their Common Stock holdings.
12. On June 23, 1944, plaintiff’s Certificate of Organization was amended to provide that on and after August 1, 1944 the number of shares of capital stock that may be issued by plaintiff would be 550,000 shares, divided into 100,000 shares of Preferred Stock with a par value of $100 per share, and 450,000 shares of Common Stock with a par value of $20 per share. Immediately prior to said amendment, plaintiff’s Certificate of Organization provided for the issuance of 450,000 shares of Common Stock with a par value of $20 per share, 50,000 shares of Preferred Stock with a par value of $100 per share and 50,000 shares of $6 Preferred Stock with no par value.
13. Prior to and during the period from June 23, 1944 to August 1,1944, the by-laws of plaintiff provided that the $6 and 7% Preferred Stocks were redeemable upon any dividend date at $110 per share.
14. Under the Plan adopted by its stockholders on June 23, 1944, to redeem and replace its 7% and $0 Preferred Stocks, plaintiff, on June 30, 1944, offered to the holders of such old Preferred Stock a right to exchange their old Preferred Stock for new 4% Preferred Stock of the plaintiff on the basis of one share of old Preferred Stock for one share of new Preferred Stock, plus accumulated dividends payable on August 1,1944 plus a cash payment of $8 per share. Under said plan, all old Preferred Stock not exchanged pursuant to said plan by July 22,1944 was to be redeemed at the rate of $110 per share plus the final quarterly dividend which was payable on August 1, 1944.
15. Effective August 1,1944, new by-laws of plaintiff were adopted. Among other things, call prices for the new preferred stock varying from $104 to $106, depending upon the date of redemption were established. Also a provision was included in said by-laws prohibiting the issuance of new preferred stock in excess of 60,587 shares without the affirmative vote of a majority of the voting power of the outstanding new preferred stock, unless the earnings of plaintiff for any twelve consecutive months within the fifteen calendar months *544 next preceding any such proposed transaction equaled 1% times annual interest and preferred dividend requirements.
IS. Pursuant to the Plan described in finding 14 above and prior to July 23,1944, holders of 20,354 shares of the $6 Preferred Stock and holders of 19,233 shares of the 1% Preferred Stock accepted the offer made under the Plan and pursuant thereto, in 1944, 39,587 shares of 4% Preferred Stock were issued to the old shareholders, together with a cash payment on the basis of $8 per share in an aggregate amount of $316,696, which amount was charged on the books of the plaintiff to earned surplus. This cash payment was in addition to the amount paid to these same stockholders as their regular quarterly dividend in the total amount of $64,188.75.
17. Holders of 21,000 shares of the old Preferred Stock did not exchange said shares for the new 4% Preferred Stock of Plaintiff and in accordance with the Plan said old Preferred shares were redeemed, on August 1, 1944, at $110 per share, by an aggregate payment to the holders thereof of $2,310,000; $10 per share of the $110 per share redemption price represented call premium. Accordingly, a premium of $210,000 was paid by plaintiff in connection with the redemption of its old Preferred Stock. The premium paid was in addition to the amount paid to these same stockholders as their regular quarterly dividend in the total amount of $34,724.25.
18. The premium paid by Idaho Power Company in connection with the redemption of its 7 % and $6 Preferred Stock in the amount of $210,000 was charged to earned surplus on the books of Idaho Power Company.
19. The total capital paid in in respect of the issuance of each share of the 28,457 shares of $6 Preferred Stock and 32,130 shares of 7% Preferred Stock which were exchanged or redeemed as described in findings 16 and 17 hereof, was in the amount of $100 per share.
20. The face of the certificate of stock representing the 7 % Preferred Stock of Idaho Power Company contains the following statement:
“This Certifies that is the owner of full-paid and non-assessable shares of the par value oe $100 each oe the preeerred stock (7%) of Idaho Power Company, transferable on *545 the books of the Corporation by the holder in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. The Preferred Stock, pari passu, with the $6 Preferred Stock, is entitled in preference to the Second Preferred Stock and the Common Stock to cumulatiYe dividends at the rate of 7% per annum and in any distribution of assets, other than profits, to the payment of the full par value thereof and accumulated dividends; the $6 Preferred Stock, pari passu with the Preferred Stock, is entitled in preference to the Second Preferred Stock and the Common Stock to cumulative dividends at the rate of $6 per share per annum and in any distribution of assets, other than profits, to the payment of $100 per share and accumulated dividends; subject to the rights of the holders of Preferred Stock and $6 Preferred Stock and and in subordination thereto the Second Preferred Stock shall be entitled in preference to the Common Stock to noncumulative dividends at the rate of 7% per annum and in any distribution of assets, other than profits, to the payment of the full par value thereof; the Common Stock is entitled to all other dividends and distributions ; upon vote of a majority in interest of the Common Stock, either the Preferred Stock, $6 Preferred Stock or Second Preferred Stock, or all thereof, are subject to redemption upon any dividend date at 110% of par, $110 per share and at par, respectively, plus, in the case of Preferred Stock, accumulated dividends, on thirty (30) days’ notice by mail; all as more fully provided in the amended Certificate of Organization and the amended By-Laws of the Corporation, a copy of each of which is on file with the Transfer Agent. The Preferred Stock, the $6 Preferred Stock, the Second Preferred Stock and the Common Stock are issued subject to all the provisions of the amended Certificate of Organization and the amended By-Laws of the Corporation and the holder hereof agrees to said provisions by the acceptance of this Certificate. Certain of said provisions, including those above referred to, are endorsed hereon. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.”
21. The face of the certificate of stock representing the $6 Preferred Stock of Idaho Power Company contains the same statement as set forth in finding 20 in respect of the 7 % Preferred Stock except that in lieu of the words “oe the Par Value oe $100 Each oe the Preeerred Stock (7%)” ap *546 pear the words “Without a Par or Face Value of the $6 Preferred Stock”.
22. Meetings of Directors and Stockholders of plaintiff were held during April, May, June and July of 1944 at which action was taken in respect of the redemption and replacement of plaintiff’s 7% and $6' Preferred Stock and related matters.
23. Various documents were transmitted to plaintiff’s stockholders in connection with the redemption and replacement of plaintiff’s 7% and $6 Preferred Stock among which were the following:
Letter to Stockholders dated May 22,1944
Notice of Call, Eedemption and Payment of All Issued and Outstanding 7% and $6 Preferred Stock of Idaho Power Company dated June 30,1944
Form transmitting 7% and $6 Preferred Stock Ee-demption Checks
Form transmitting 7% and $6 Preferred Stock exchange checks
Form of acknowledgment by Idaho Power Company of receipt of Preferred Stock Certificates
24. At the beginning of 1944, plaintiff had accumulated earnings and profits of $190,297.02. Additions to earnings and profits during the year 1944, before reduction on accoimt of plaintiff’s 1944 Federal income and excess profits taxes and State of Idaho income tax, were $1,961,646.92, so that at the end of the year plaintiff’s accumulated earnings and profits before Federal and State income and profits taxes amounted to $2,151,943.94.
25. The amount of additions to earnings and profits of plaintiff during the year 1944 after reduction on account of plaintiff’s 1944 Federal income and excess profits taxes and State of Idaho income tax but before giving effect to any allowance under plaintiff’s claim was $1,043,778.30. If plaintiff’s claim is allowed in whole or in part due effect must be given in determination of the amount of additions to earnings and profits of plaintiff during the year 1944 to the recomputation of plaintiff’s 1944 Federal income and excess profits tax and State of Idaho income tax liabilities as stated in findings 26 and 27 hereof.
*547 26. In the computation of plaintiff’s State of Idaho income tax liability for the calendar year 1944, the amount of plaintiff’s Federal income and excess profits tax liability for the calendar year 1944 is applied as a deduction from gross income in computing net income subject to said tax; and if plaintiff’s claim is allowed in whole or in part the fact as stipulated in this finding must be taken into account in recomputation of plaintiff’s income and excess profits tax liability under Eule 38' of this Court.
27. In the computation of plaintiff’s Federal income and excess profits tax liability for the calendar year 1944, the amount of plaintiff’s State of Idaho income tax liability for the calendar year 1944 is applied as a deduction from gross income in computing net income subject to said tax; and if plaintiff’s claim is allowed in whole or in part the fact as stipulated in this finding must be taken into account in recomputation of plaintiff’s income and excess profits tax liability under Eule 38 of this Court.
28. During the year 1944 plaintiff made the following cash distributions to its preferred and common stockholders:

Distribution Payment date Amount

Regular preferred dividend on 7% and $6 Feb. 1 $98,913.00 Preferred Stocks.
Regular dividend on Common Stock_ Feb. 21 180,000.00
Regular preferred dividend on 7% and $6 May 1 98,913.00 Preferred Stocks.
Regular dividend on Common Stock_ May 20 180, 000.00
Regular preferred dividend on 7% and $6 Aug. 1 98,913. 00 Preferred Stocks.
Cask payment of $8 per share paid on ex- Aug. 1 316,696.00 change of 39,587 shares of 7% and $6 Preferred Stocks.
Call premium of $10 per share paid on re- Aug. 1 210,000.00 demption of 21,000 shares of 7% and $6 Preferred Stocks.
Regular dividend on Common Stock_ Aug. 21 180, 000. 00
Regular dividend on 4% Preferred Stock_ Nov. 1 60, 587.00
Regular dividend on Common Stock_ Nov. 21 180, 000.00
Total distribution to stockholders. $1, 604,022. 00
29.In its Federal income tax return for the year 1944, plaintiff did not claim or receive any dividends paid credit *548 under Section 28 (h) of tbe Internal Eevenue Code of 1939 for the aforesaid cash distribution of $316,696 paid August 1 to the stockholders who exchanged their stock or for the amount of $210,000 call premium paid August 1 to the stockholders who redeemed their stock.
30. The following statements appear in the Protest dated June 9, 1949 sworn to by an officer of plaintiff and filed by plaintiff with the Internal Eevenue Agent in Charge, Salt Lake Division, at page 4 :•
“The offer further provided that such $6 and 7% Preferred shares that were not offered for exchange before the exchange period expired would be retired by appropriate call and by a cash payment to the shareholders of $110 per share”.
At page 5:
“Following the exchange the remaining outstanding preferred shares were redeemed at the rate of $110 per share for a total consideration of $2,310,000”.
31. The following statement appears on pages 22 and 23 of the “Supplemental Protest to Proposed Eejection of Claim for Eefund” dated January 12,1951 and filed by counsel for plaintiff with the Technical Staff Northwestern Division:
“In this connection reference is made to the protest heretofore filed wherein it was pointed out that, as part of the 1944 recapitalization, the taxpayer redeemed all of its outstanding $6 and 7°/o Preferred Stock that was not exchanged under the exchange offer at the rate of $110 per share for a total consideration of $2,310,000. The number of shares so redeemed was 21,000 and $10 out of the $110 redemption price represented call premium. Accordingly, a premium of $210,000 was paid in connection with this redemption. Under the decision in Commissioner v. Estate of Bedford, as applied by the decision of the Court of Appeals for the Second Circuit in Kirschenbaum v. Commissioner (supra), it would appear that such premium constituted a taxable dividend and that the taxpayer is entitled to a credit therefor under Code Section 26 (h) in addition to the credit claimed for the $316,696 distributed to the exchanging Preferred shareholders. However, at this time the taxpayer does not intend to urge vigorously that it is entitled to such additional credit and makes reference thereto only for the purpose of noting the point and the *549 further purpose of pointing out how well imbedded in the law has become the doctrine as here contended in support of its refund claim”.
32. The following statement appears on pages 34 and 35 of the “Supporting Statement to Appellate Staff Memorandum” dated February 19, 1953 in which it was determined that plaintiff’s claim for refund referred to hereinabove in finding 10 should be rejected:
“Considering now the nature of the distribution of $316,696.00, it may be noted somewhat parenthetically that in addition to the payment of that amount to stockholders who took advantage of the opportunity of exchanging their old preferred shares for new stock, the taxpayer paid the sum of $210,000.00 as a premium to the nonexchanging holders of 21,000 shares who elected to surrender their stock to the corporation at the redemption price of $110.00 per share. The taxpayer maintains that under the reasoning of certain cases on which it leans and which will be hereinafter referred to, since the sum of $372,856.26 remained available for ‘dividends’ under its theory, it may be reasoned that this sum of $210,000.00, as well as the sum of $316,696.00, constituted a distribution taxable as a dividend and that it is entitled to a credit therefor under section 26 (h) of the Code in addition to the credit claimed for the $316,696.00 distributed to the exchanging shareholders. In the brief submitted to the Appellate Division under date of January 12, 1951, however, the taxpayer states that its position with respect to the additional sum of $210,000.00 is that it ‘does not intend to urge vigorously that it is entitled to such additional credit and [that it] makes reference thereto only for the purpose of pointing out how well embedded in the law has become the doctrine as here contended in support of its refund claim’ ”.
33. In a letter dated February 19,1953 from the Assistant District Commissioner, Appellate, plaintiff was informed that careful consideration had been given to the statements made in the claim for refund, to the protest dated June 10, 1949 (referred to in finding 30 above as dated June 9,1949) and to the supplemental protest referred to in finding 31 above.
34. During August 1943 Electric Power & Light Corporation as the holder of all of the 150,000 outstanding shares of *550 tbe Common Stock of Idaho Power Company of a par value of $100 per share and 2,670 shares of the 7% Cumulative Preferred Stock of that Company of a par value of $100 per share surrendered to Idaho Power Company 60,000 shares of such Common Stock and 2,670 shares of such Preferred Stock.
35. Journal Voucher No. 175 recorded on the books of Idaho Power Company the surrender of the shares of stock of Idaho Power Company by Electric Power & Light Corporation.
36. Journal Voucher No. 176 recorded on the books of Idaho Power Company the disposition of the capital surplus account created as shown by Journal Voucher No. 175.
37. The findings and opinions of the Securities and Exchange Commission as found at pages 848 to 853, inclusive, of Volume 13 of the Securities and Exchange Commission Decisions and Eeports, relate to said surrender of shares of Idaho Power Company stock by Electric Power & Light Corporation.
38. The tax cost base of the 60,000 shares of Common Stock and 2,670 shares of Preferred Stock of Idaho Power Company in the hands of Electric Power & Light Corporation immediately prior to surrender thereof by that Corporation to Idaho Power Company was:
2,670 Shares of Preferred Stock-$ 256, 740. 00
60,000 Shares of Common Stock_$3, 610, 898. 58
39. Electric Power & Light Corporation on September 3, 1943 sold 450,000 shares of Idaho Power Company Common Stock to Blyth & Company Inc. and Lazard Freres & Company, both of New York City, for a cash consideration of $10,361,250. Said 450,000 shares of the Common Stock of Idaho Power Company had been received by Electric Power & Light Corporation shortly before the sale .thereof in exchange for surrender to Idaho Power Company of the 90,000 shares of $100 par value of Idaho Power Company Common Stock previously held by Electric Power & Light Corporation.
40. The tax base balance sheet of Idaho Power Company as of July 31,1916 shows that the 7 % Cumulative Preferred Stock had a then book value of $100 par value per share and *551 the 150,000 shares of Common Stock of a par value of $100 per share had a then aggregate book value of $7,207,620.96.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.