**KENTUCKY UTILITIES COMPANY,**
**Plaintiff,**

v.

**Seldon R. GLENN and William M. Gray,**
**Defendants.**

**OLD DOMINION POWER COMPANY,**
**Plaintiff,**

v.

**Seldon R. GLENN and William M. Gray,**
**Defendants.**

**Civ. A. Nos. 3516, 3527.**

United States District Court
W. D. Kentucky,
at Louisville.

Oct. 15, 1965.

Malcolm Y. Marshall, Ogden, Robertson & Marshall, Louisville, Ky., for plaintiffs.

E. W. Rivers, U. S. Atty., Louisville, Ky., for defendants.

SHELBOURNE, District Judge (sitting by designation).

The above-styled cases were filed seeking recovery of taxes alleged to have been erroneously assessed and collected by the Commissioner of Internal Revenue, hereinafter referred to as Commissioner. The actions were consolidated for the purpose of trial and tried before the Court without intervention of a jury. The action instituted by Kentucky Utilities Company, hereinafter referred to as K-U, presents five issues, one of which involves the deductibility of certain social security taxes. The only issue in the action brought by the Old Dominion Power Company is the deductibility of social security taxes. Inasmuch as each of the questions to be considered involves separate and distinct supporting facts, the Court makes separate findings of fact and conclusions of law as to each of the issues.

## I

## DEPRECIATION OF LAND AND FLOWAGE RIGHTS

In each of the tax years 1947 through 1953, K-U owned and operated Dix Dam and a hydroelectric station on the Dix River in Mercer County, Kentucky and a hydroelectric station at Lock and Dam No. 7 on the Kentucky River below the point at which Dix River flows into the Kentucky River. Prior to 1947, K-U expended a total sum of $896,629.27 for flowage rights in connection with the operation and ownership of its dam and hydroelectric facilities. The expenditure for flowage rights included the relocation and construction of a new waterworks system for the City of Danville at a cost of $216,870.29 in exchange for the right to flood the existing waterworks with K-U's Dix Dam Reservoir. The reservoir also inundated existing highways and bridges and the sum of $307,-185.98 was expended by K-U in the relocation and construction of new highways and bridges. The Dix Dam Reservoir inundated tracts of land owned by several hundred individuals and the right to

flood those tracts was acquired from the owners by K-U at a cost of $372,-573.00.

The parties have stipulated that the dam and hydroelectric stations, as constructed and constituted during each of the tax years here involved, have a useful life not in excess of 100 years; that the flowage rights have no value other than as they are used with a dam and hydroelectric stations at the present locations and would have no value when K-U ceases to operate any dam and hydroelectric stations at such locations.

The Commissioner does not dispute K-U's use of 100 years as the useful life of the dams and hydroelectric stations in taking a deduction for their depreciation. The contention of the Commissioner is that no useful life for the flowage rights acquired from the property owners has been or could be reasonably established, and he refuses to allow any deduction for the land and flowage rights. K-U argues that the useful life of the rights to flood the land is limited to the useful life of the dam and reservoir.

The deduction is claimed by K-U under Section 23(l) of the 1939 Internal Revenue Code which provides that in computing net income there shall be allowed as a deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * *

"(1) of property used in trade or business, or

"(2) of property held for the production of income."

At the trial of these actions the Commissioner reserved the question of whether the conveyances from the individual property owners conveyed a fee in the land or an easement. In a brief filed subsequent to the trial, the Commissioner concedes that, by virtue of KRS 416.-130 and case law in Kentucky construing that statute and conveyances similar to those here involved, K-U acquired only an easement. See McGee v. City of Wil-

liamstown, Ky., 308 S.W.2d 795 (1957); Rose v. Bryant, Ky., 251 S.W.2d 860 (1952); Kentucky-West Virginia Gas Co. v. Hays, 238 Ky. 189, 37 S.W.2d 17 (1931); Keown v. Brandon, 206 Ky. 93, 266 S.W. 889 (1924); Morris v. Schollsville Branch Red River Turnpike Road, 69 Ky. 671 (1869).

In the case of Union Electric Co. of Missouri v. Commissioner, 10 T.C. 802, affirmed, 8 Cir., 177 F.2d 269 (1949), the facts are strikingly similar to those in this case. It was there held that the costs of rights and easements to flood property and the cost of condemnation of flowage rights, which revert to the original owners upon non-use for the purpose for which condemned, constituted rights inseparably linked with the useful life of the present dam and "their costs are and should be considered as a part of the depreciable costs of the plant." The reasoning in the Union Electric case was the basis of the same court's decision in Northern Natural Gas Co. v. O'Malley, 8 Cir., 277 F.2d 128 (1960).

It has been conceded by the Commissioner in this case that the instruments by which K-U acquired the flowage rights from the landowners were mere easements, despite that in many instances the language of the instruments purported to convey the land in fee simple. Therefore, it is concluded that such easements end and the right to flood such land cease when no longer used with the dam, reservoir and hydroelectric stations on Dix River and Kentucky River as now located.

With respect to the depreciation of land and flowage rights obtained by K-U, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. K-U will not repair or improve Dix Dam and its hydroelectric stations on the Dix River and at Lock and Dam No. 7 on the Kentucky River so as to extend their useful life beyond a period of 100 years from their original construction.

2. Upon the expiration of the useful life of Dix Dam and the hydroelectric stations, at a time not in excess of 100 years from their original construction, K-U will not replace such structures with another dam and other hydroelectric stations.

3. The land and flowage rights referred to in paragraph 3 of the stipulation filed herein, obtained at a total cost to K-U of $896,629.27, have no value except as they are used in connection with the present Dix Dam and K-U's present hydroelectric stations on Dix River and at Lock and Dam No. 7 on the Kentucky River.

4. The land and flowage rights obtained by K-U have useful lives not in excess of 100 years from the date of the original construction of Dix Dam and the hydroelectric stations on Dix River and the Kentucky River at Lock and Dam No. 7.

### CONCLUSION OF LAW

1. Pursuant to Section 23(*l*) of Internal Revenue Code of 1939 and under the authority of Union Electric Co. of Missouri v. Commissioner of Internal Revenue, 8 Cir., 177 F.2d 269 (1949), K-U is entitled to an annual allowance for the exhaustion of the land and flowage rights of 1% of their costs, or a deduction each year in the amount of $8,966.29.

### II

### COMPUTATION OF EXCESS PROFIT CREDITS UNDER SECTION 448 OF THE INTERNAL REVENUE CODE OF 1939

One of the issues in the K-U case was whether the Commissioner properly computed excess profit credits under Section 448 of the Internal Revenue Code of 1939 for the years 1950–1953, inclusive. Subsequent to the trial of these actions, Treasury Regulations 130, Section 40.-448–2(e) (2), was amended and, in effect, K-U's position on this question was

adopted. K-U was advised that because of the amendment the Commissioner conceded the issue, but refund would be deferred until this litigation is completed and the amount of refund attributable to excess profit credits can be determined.

### III

### DEDUCTIBILITY OF THE PINEVILLE GENERATOR DAMAGE

As the result of an accident on September 12, 1951, a steam generator at K-U's Pineville hydroelectric plant was damaged and the total cost of repairs amounted to $147,537.60. The Commissioner originally allowed K-U to deduct the amount of $44,486.67 as a loss in 1951 but K-U claimed that it was entitled to take the deduction in 1953. The Commissioner now agrees that K-U was entitled to take the deduction in 1953, but only in the amount of $10,000.00. The Commissioner has concluded that any amount in excess of $10,000.00 is not deductible either as a loss under Section 23(f) or as an ordinary and necessary business expense under Section 23(a) of the Internal Revenue Code of 1939.

At the time of the accident, K-U had an insurance policy with Lloyds of London which covered the damage to the generator subject to a deduction of the first $10,000.00. Subsequent to its investigation of the accident, K-U concluded that the entire damage was within the terms of the manufacturer's warranty contained in its purchase contract with Westinghouse Electric Corporation. At the end of 1951, therefore, K-U had no reason to believe that it had sustained any loss due to the accident and the resulting damage to its generator.

Westinghouse completed studies to determine the cause of the damage in June, 1952 and, as a result of its tests, denied responsibility for the damage and liability under its warranty. Lloyds did not deny liability under its policy for the entire cost of repairs to the generator in excess of $10,000.00, but Lloyds did insist upon its right of subrogation against Westinghouse if it paid K-U's claim. It appears that litigation might have adversely affected K-U's business relations with Westinghouse. On the other hand, if Lloyds had been required to pay all of the loss in excess of $10,000.00, it might have been difficult for K-U to retain insurance coverage on its equipment.

In January, 1953, Westinghouse, Lloyds and K-U agreed to a settlement whereby K-U assumed responsibility for $44,486.67, of the total repair costs, $34,486.67 of which it could have recovered under its policy of insurance with Lloyds.

The issue raised by this set of circumstances is whether the $34,486.67 assumed by K-U under the settlement agreement can be deducted either as a loss or as an ordinary and necessary business expense.

In Protzmann v. Commissioner of Internal Revenue, 1 Cir., 276 F.2d 684 (1960), the court stated the rule to be that, when a claim is disputed and a settlement is made, the amount not recovered is allowable as a loss. Although the settlement here resulted in an amount unrecovered by K-U, the Commissioner contends that any amount in excess of $10,000.00 is not a loss because K-U's claim against Lloyds was not in dispute.

The remaining question to be considered is whether K-U is entitled to deduct the $34,486.67 in excess of the $10,000.00 deductible as an ordinary and necessary business expense.

In support of the contention that the $34,486.67 is not deductible as an ordinary and necessary business expense, the Commissioner cites the case of A. Giurlani & Bro. v. Commissioner of Internal Revenue, 9 Cir., 119 F.2d 852 (1941). The court held there that a payment to creditors by an importing company on behalf of an Italian corporation to save the latter from bankruptcy was non-deductible because the corporation constituted the sole source of supply for the taxpayer's most profitable item of merchandise. Although the court assumed, arguendo, that the payment was necessary in a busi-

ness sense, it held that such an expenditure was not ordinary in the common, accepted use of that term.

The Court makes the following findings of fact and conclusions of law as to the deductibility of the Pineville generator loss.

### FINDINGS OF FACT

1. A steam generator in K-U's plant at Pineville, Kentucky was damaged as the result of an accident which occurred September 12, 1951. The generator was manufactured by Westinghouse Electric Corporation and sold to K-U, subject to a warranty, only a few months prior to the accident. Based upon statements of its own operating personnel and an investigation and report of the engineering firm of Sargent & Lundy, K-U concluded that the damage resulted from mechanical failure within the generator and that Westinghouse under its warranty should pay the cost of repairs in the amount of $147,537.60.

2. K-U's policy of insurance with Lloyds of London covered damage to its equipment caused by accidents such as the one involved here, Lloyds' limit of liability under the policy being $200,000.00 subject to $10,000.00 deductible. Lloyds did not question the effectiveness of the insurance coverage or that this accident was within the coverage of the policy, and did not at any time deny liability under its policy for the entire cost of repairs to the generator in excess of $10,000.00.

3. During 1951, K-U had a reasonable expectation of recovering the entire amount of the damage to the generator from Westinghouse under its warranty and/or Lloyds under the insurance policy, and K-U had no reason to conclude that it had suffered any loss not compensated for by insurance or otherwise.

4. Tests conducted by Westinghouse to establish the cause of damage to the generator were completed in June, 1952. The tests demonstrated that real and genuine issues existed as to the cause of damage and whether Westinghouse in fact had any liability under its warranty. As a result of the tests, Westinghouse denied responsibility for the damage and liability under its warranty.

5. Lloyds insisted upon its right of subrogation in the event it paid K-U's claim, and insisted that Westinghouse under its warranty should be responsible for the entire cost of repairs.

6. For business reasons, K-U did not want any litigation brought against Westinghouse. Moreover, because of possible difficulty in retaining insurance of this character on its equipment, K-U did not want Lloyds to pay all of the loss except the $10,000.00 deductible under the policy.

7. In January, 1953, a settlement was reached whereby Westinghouse paid $65,550.93 of the total cost of repairs to the generator, Lloyds paid $37,500.00 and relinquished any right of subrogation against Westinghouse, and K-U assumed the remaining $44,486.67. The terms of this settlement were such that they could not have been in any way anticipated or ascertained in 1951. The transaction was not closed or completed during 1951 or at any time prior to the settlement agreement in January, 1953.

8. K-U voluntarily assumed $34,486.67 of the cost of repairs to the generator to protect Westinghouse from suit by Lloyds and to avoid difficulty in obtaining insurance with Lloyds. The expenditure of $34,486.67 in this manner does not constitute a loss or an ordinary and necessary business expense.

9. K-U sustained a loss of $10,000.00 in 1953.

### CONCLUSIONS OF LAW

1. K-U did not sustain any loss during 1951 which was not compensated for by insurance or otherwise, within the meaning of Section 23(f) of the Internal Revenue Code of 1939, and could not have deducted any loss by reason of the damage to its generator on its tax returns for 1951.

2. The settlement agreement provided that K-U assume $44,486.67 of

the cost of repairs to the generator. Even though the settlement resulted in an amount unrecovered by K-U, any amount in excess of the $10,000.00 deductible under the policy cannot be considered as a loss because K-U's claim against Lloyds was not in dispute. K-U is not entitled to a deduction of $34,486.67 as a loss not compensated for by insurance or otherwise under Section 23(f) of the 1939 Internal Revenue Code.

■ 3. The Court is not persuaded that K-U's voluntary assumption of the $34,486.67 of the cost of repairs to the generator can be considered an ordinary expense of its business although such an expenditure may have been expedient under the circumstances. To say that K-U accepted liability for an amount which could have been recovered through insurance because it wanted to maintain good business relations with its supplier and retain insurance coverage on its equipment is not sufficient to change the extraordinary character of such expense to something normal, usual or customary. A. Giurlani & Bro. v. Commissioner of Internal Revenue, 9 Cir., 119 F.2d 852 (1941). K-U is not entitled to deduct the $34,486.67 as an ordinary and necessary business expense under Section 23 (a) of the 1939 Internal Revenue Code.

4. K-U is entitled to a deduction of $10,000.00 for the year 1953 as a loss not compensated for by insurance or otherwise under Section 23(f) of the 1939 Internal Revenue Code.

## IV

## DEDUCTIBILITY OF SOCIAL SECURITY TAXES

During the years 1947 through 1953, K-U paid social security taxes in connection with construction and retirement work in progress, and Old Dominion Power Company, a wholly-owned subsidiary of K-U, paid taxes of like nature during the years 1949 through 1951. Under Sections 23(a) and (c) of the Internal Revenue Code of 1939, such taxes were deductible expenses. Section 24(a) (7)

and Treasury Regulations 111 and 118, Sections 29.24–5(c) and 39.24(a)–6(c), respectively, provided that the taxpayers could elect to capitalize the social security taxes paid instead of deducting them as current expenses. However, if a taxpayer elected to capitalize such taxes incurred on a given project, the election was binding upon the taxpayer in subsequent years, and all such taxes resulting from that project had to be capitalized.

In these actions, K-U contends that the Commissioner erred in disallowing a deduction for the years 1947 through 1953 for social security taxes paid in connection with all construction and retirement work then in progress. Old Dominion makes the same contention with regard to the years 1949 through 1951. In their respective tax returns for the years in question, except K-U's returns for 1952 and 1953, the companies claimed no deductions for the taxes paid but schedules attached to the returns listed these taxes in an analysis of deductible taxes. In amended returns, the companies claimed the taxes as deductible expenses under Section 23(a) and (c). The Commissioner disallowed the claimed deductions in K-U's original returns for 1952 and 1953 and the amended returns of each company.

The Commissioner concedes that neither K-U nor Old Dominion filed a statement in any of the years in question electing to treat the social security taxes paid by each company as chargeable to capital account, as provided for in the Treasury Regulations. The Commissioner argues that, although neither company filed a formal election to capitalize such taxes, the schedules attached to their tax returns constituted a statement sufficient under the regulations to indicate an election to treat such taxes as chargeable to capital account.

The ultimate question decisive of the right of K-U and Old Dominion to recover the social security taxes is whether the method of handling the payment of the taxes on the books of the companies

amounted to an election to capitalize the taxes as required by the language of the Treasury Regulation adopted by the Commissioner pursuant to Section 24(a)(7) of the 1939 Revenue Code, as follows:

> "*Manner of exercising election.* If the taxpayer elects to capitalize an item or items under this section, such election shall be exercised by filing with the original return a statement for that year indicating the item or items (whether with respect to the same project or to different projects) which the taxpayer elects to treat as chargeable to capital account * * *."

The regulation was permissive in allowing the taxes to be capitalized and specific in requiring the election to capitalize to be evidenced by a statement filed with the original tax return for that year.

The facts are not in serious dispute. The Court finds as the essential facts:

## FINDINGS OF FACT

1. During the year 1947 through 1953, K-U paid federal and state social security taxes which were deductible as expense from its gross income for the years in which paid.

2. Social security taxes for the years 1947 through 1951 were not deducted or claimed by K-U in its original returns for those years; the taxes were claimed as expense in amended returns and disallowed by the Commissioner.

3. On K-U's returns for the years 1952 and 1953, similar taxes were deducted and claimed as expense; the deductions were disallowed by the Commissioner.

4. K-U filed no formal statement indicating an election to capitalize the payment of social security taxes in any year from 1947 through 1953.

5. During the years 1949 through 1951, Old Dominion paid federal and state social security taxes which were deductible from gross income for the years in which paid.

6. Social security taxes were not deducted or claimed by Old Dominion in its original tax returns for the years 1949 through 1951; the taxes were claimed as expense in amended returns for those years and were disallowed by the Commissioner.

7. Old Dominion filed no formal statement indicating an election to capitalize the payment of social security taxes in any year from 1949 through 1951.

## CONCLUSIONS OF LAW

1. K-U did not exercise an election to capitalize the social security taxes in issue in any year from 1947 through 1953, nor did Old Dominion make such an election in any year from 1949 through 1951. Gulf Atlantic Transportation Co. v. United States, 56–2 T.C. par. 10,052 (1956).

2. The social security taxes here involved were deductible expenses under Section 23(a) and (c) of the 1939 Internal Revenue Code, and

a. K-U is entitled to deductions for those expenses on its amended returns for the years 1947 through 1951 and on its original returns for the years 1952 and 1953;

b. Old Dominion is entitled to deductions for those expenses on its amended returns for the years 1949 through 1951.

## V

## SECTION 26(h) CREDIT

K-U is claiming credit against income for surtax purposes in the amount of dividends alleged to have been paid during the year 1947 on its preferred stock which was outstanding prior to 1942 and as of the beginning of 1947 and its new preferred stock issued in 1947.

K-U amended its charter in 1947 to authorize the issuance of 200,000 shares of 4¾% preferred stock with which it proposed to refinance by exchange or redemption 76,001 shares of 6% preferred stock, par value $100.00, and 108,196 shares of 7% preferred stock, par value $50.00. K-U issued 130,000 shares of

the 4¾% preferred stock on September 1, 1947. The shareholders of the then outstanding 6% and 7% preferred stock were offered an exchange pursuant to the following terms set forth in a resolution adopted by K-U's Board of Directors:

"Holders of outstanding shares of 6% Preferred Stock, $100 par value, have the right to exchange their shares for shares of now preferred Stock on a share for share basis and holders of outstanding shares of Junior Preferred Stock, $50 per value, have the right to exchange their shares for shares of the new Preferred Stock on the basis of two shares of Junior Preferred Stock for one share of new Preferred Stock. * * * Holders of the outstanding 6% Preferred Stock and Junior Preferred Stock accepting the Exchange Offer will receive in cash, in respect of each share of new Preferred Stock delivered in exchange, an amount equal to the difference between (a) $100 per share for the new Preferred Stock plus accrued dividends thereon to the date of redemption of the unexchanged shares of outstanding old preferred stock, and (b) the redemption price of the shares of old preferred stock surrendered in exchange, i. e. $110 per share in the case of the 6% Preferred Stock and $55 per share in the case of Junior Preferred Stock, plus in each case accrued dividends, thereon to the date of redemption. Shares of old preferred stock not exchanged in accordance with the Exchange Offer will be called for redemption."

Holders of 61,014 shares of 6% preferred stock and 72,404 shares of 7% preferred stock accepted the exchange offer and received in the exchange 97,216 shares of the 4¾% preferred stock, plus a cash adjustment hereinafter described. Holders of 14,997 shares of the 6% preferred stock and 35,792 shares of 7% preferred stock elected not to accept the exchange offer. For the 6% preferred stock redeemed, the shareholders received $110.00 per share plus an amount equivalent to the accrued dividends to the redemption date, and the 7% preferred stock was redeemed at $55.00 per share plus an amount equivalent to the accrued dividends to the redemption date, as hereinafter set forth.

The 32,784 shares of the new 4¾% preferred stock remaining of the 130,000 shares issued in the refinancing were sold to underwriters for cash, effective date of sale being October 20, 1947. From September 1 to October 20, dividends on the new 4¾% preferred stock had accrued in the approximate amount of 65¢ per share or a total of $21,195.74 on the 32,784 shares. The underwriters paid K-U the par value of $100.00 per share for the 32,784 shares plus $21,-195.74, the amount of accrued dividends.

K-U's principal claim on the Section 26(h) credit is that it is entitled to be allowed the cash premiums of $10.00 per share on the 6% preferred stock and $5.00 per share on the 7% preferred stock paid in connection with the exchange and redemption of such stock as follows:

| | |
|---|---|
| Exchange premiums 61,014 shares of 6% preferred stock | $610,140.00 |
| Exchange premiums 72,404 shares of 7% preferred stock | 362,020.00 |
| Total exchange premiums | $972,160.00 |
| Redemption premiums 14,997 shares of 6% preferred stock | $149,970.00 |
| Redemption premiums 35,792 shares of 7% preferred stock | 178,960.00 |
| Total redemption premiums | $328,930.00 |

The Commissioner claims that the cash premiums totalling $1,301,090.00 on the stock exchanged and redeemed were not dividends but "merely a portion of the purchase price paid by K-U for reacquisition of its stock."

In addition to its claim for cash premiums paid on the exchange and redemp-

tion of the 6% and 7% preferred stock, at the time the briefs were filed following the trial and the filing of stipulations, K-U claimed:

1. Dividends accrued from 10–1–47 to 11–20–47 on 6% preferred stock exchanged ... $ 50,639.95

2. Dividends accrued from 8–1–47 to 11–20–47 on 7% preferred stock exchanged ... 76,743.33

3. Dividends accrued from 10–1–47 to 11–20–47 on 6% preferred stock redeemed ... 12,227.48

4. Dividends accrued from 8–1–47 to 11–20–47 on 7% preferred stock redeemed ... 37,790.70

5. Dividends accrued from 9–1–47 to 11–20–47 on 4¾% preferred stock issued in exchange for 6% and 7% preferred stock ... 101,104.64

6. Dividends accrued from 9–1–47 to 10–20–47 on 4¾% preferred stock sold to underwriters ... 21,195.74

The Commissioner concedes that K-U is entitled to credits of $50,639.95 on Item 1 and $76,743.33 on Item 2, or a total of $127,383.28 for accrued dividends on 6% and 7% preferred stock exchanged for 4¾% preferred stock. By a letter addressed to the Court dated April 16, 1965, counsel for the Commissioner concedes that K-U is entitled to credits of $12,227.48 on Item 3 and $37,790.70 on Item 4, or a total of $50,018.18 for accrued dividends on 6% and 7% preferred stock redeemed.

As to Items 5 and 6, it was stipulated that, on the exchange of the old preferred stock for the new 4¾% preferred stock, holders of 61,014 shares of 6% stock received cash payments of $9.79 per share and holders of 7% stock received $11.08 for each two shares. The payments represented the amount of the cash premium and accrued dividends on the 6% and 7% preferred stock, less accrued dividends on the 4¾% preferred stock for the period from September 1 to November 20, 1947, as follows:

|  | Each Share of $100 Par 6% Preferred | Two Shares of $50 Par 7% Preferred |
| --- | --- | --- |
| Premium | $10.00 | $10.00 |
| Plus: Dividends accrued to 11–20–47 | .83 | 2.12 |
|  | $10.83 | $12.12 |
| Less: Dividends on 4¾% preferred accrued to 11–20–47 | 1.04 | 1.04 |
| Total cash payment | $ 9.79 | $11.08 |

On the redemption of the 6% and 7% preferred stock the cash adjustment was:

| | Each Share of $100 Par 6% Preferred | Two Shares of $50 Par 7% Preferred |
|---|---|---|
| Par value | $100.00 | $100.00 |
| Cash payment: | 10.83 | 12.12 |
| Premium | $10.00 | $10.00 |
| Dividends accrued to 11–20–47 | .83 | 2.12 |
| Total paid | $110.83 | $112.12 |

It is not disputed that K-U accrued dividends on the 6% and 7% preferred stock exchanged for the 4¾% preferred stock as follows:

| | |
|---|---|
| 83¢ per share on 61,014 shares 6% preferred stock from 10–1–47 to 11–20–47 | $ 50,639.95 |
| $1.06 per share on 72,404 shares 7% preferred stock from 8–1–47 to 11–20–47 | 76,743.33 |
| Total accrued dividends 6% and 7% preferred stock | $127,383.28 |

Accrued dividends for the period from September 1 to November 20, 1947, on the 4¾% preferred stock received in exchange for 6% and 7% preferred stock were deducted from the cash payments to shareholders as follows:

| | |
|---|---|
| $1.04 per share on 61,014 shares 6% preferred stock | $ 63,454.56 |
| 52¢ per share on 72,404 shares 7% preferred stock | 37,630.08 |
| Total accrued dividends on 4¾% preferred stock deducted from cash payments | $101,104.64 |

It is agreed that the total amount of accrued dividends on the 130,000 shares of K-U's new 4¾% preferred stock for the full quarterly period was $154,386.23. However, the Commissioner contends that this amount consists, in part, of the $101,104.64 accruing on the new shares and deducted by K-U before making cash payments on the 6% and 7% preferred stock exchanged and the $21,195.74 accrued dividends on the new shares bought by the underwriters and paid to K-U as a part of the purchase price. The Commissioner claims that K-U actually did not pay $154,386.23 in accrued dividends to the shareholders of its new 4¾% preferred stock, but paid $122,300.38 less than that amount.

K-U claims that the entire amount of the dividends accrued on the 4¾% preferred stock from the date of issuance to the first regular dividend date, $154,386.23, was paid in cash to the holders of such stock in December, 1947. Therefore, the $101,104.64 deducted from the cash payments made in the exchange of 6% and 7% preferred stock for 4¾% preferred stock as accrued dividends on such stock from September 1 to November 20, 1947, was included in the $154,386.23 accrued dividends for the full dividend period and was actually paid to the shareholders in December, 1947. K-U likewise claims that the $21,195.75 paid to it by the underwriters as a part of the purchase price of the 32,784 shares of 4¾% preferred stock was paid in cash to the exchanging stockholders and the underwriters, or their assigns as a portion of the entire amount of dividends accrued on the stock from September to December, 1947.

## FINDINGS OF FACT

1. In 1947, K-U was a public utility as defined in Section 26.(h) of the Internal Revenue Code of 1939.

2. K-U's 6% and 7% preferred stock outstanding as of the beginning of 1947 and its 4¾% preferred stock issued in September, 1947 constituted preferred stock as defined in Section 26(h).

3. K-U's charter was amended in 1947 to authorize the issuance of 200,000 shares of 4¾% preferred stock, par value $100.00, with which K-U's outstanding 6% and 7% preferred stock was to be refinanced.

4. K-U issued 130,000 shares of 4¾% preferred stock in September, 1947. Shareholders of K-U's outstanding stock subsequently exchanged 61,014 shares of 6% preferred stock and 72,404 shares of 7% preferred stock for a total of 97,216 shares of the 4¾% preferred stock and cash adjustments. The remaining 32,784 shares were sold to underwriters at par value plus the total amount of dividends accrued to the date of sale.

5. K-U called for redemption the 14,977 shares of 6% preferred stock and 35,792 shares of 7% preferred stock not exchanged for 4¾% preferred stock.

6. In connection with the exchange and redemption of the stock, K-U paid the shareholders cash premiums of $10.00 per share on the 6% preferred stock and $5.00 per share on the 7% preferred stock in a total amount of $1,301,090. The Court finds that the payment of the cash premiums' by K-U in furtherance of its refinancing program does not constitute the payment of dividends within the meaning of Section 26(h).

7. Dividends accrued on shares of the 4¾% preferred stock received by the shareholders in exchange for 6% and 7% preferred stock in a total amount of $101,104.64 for the period from the date of issuance to the date of exchange, November 20, 1947. Although K-U deducted the amount of the accrued dividends from the cash payments made to the shareholders as a part of the exchange agreement, the Court finds that the amount of $101,104.64 was included in the total accrued dividends on the 4¾% preferred stock for the full dividend period ending December 31, 1947, and was actually paid in cash by K-U to its shareholders.

8. The 32,784 shares. of 4¾% preferred stock not given in exchange for 6% and 7% preferred stock were purchased by underwriters on October 20, 1947, and on that date had accrued dividends in the amount of $21,195.74. The underwriters paid K-U the par value of $100.00 per share plus the amount of the accrued dividends. K-U's claim that it should be allowed credit for the $21,195.74 because this amount was included in the total accrued dividends paid to shareholders for the full dividend period is without merit. The Court finds that K-U actually paid accrued dividends for the period from October 20, 1947 to the end of the quarterly dividend period to shareholders who purchased stock from the underwriters, since the dividends accruing from September 1 to October 20, 1947 were a part of the purchase price paid K-U by the underwriters.

## CONCLUSIONS OF LAW

1. K-U is not entitled to a deduction under Section 26(h) for the amount of $972,160.00 paid as cash premiums on the shares of 6% and 7% preferred stock exchanged for 4¾% preferred stock or the amount of $328,930.00 paid as cash premiums on the 6% and 7% preferred stock redeemed. Hellmich v. Hellman, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544 (1928); Idaho Power Co. v. United States, 161 F.Supp. 807, 142 Ct. Cl. 534 (1958), cert. denied 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70; Atlantic City Electric Co. v. United States, 161 F.Supp. 811, 142 Ct.Cl. 519 (1958), cert. denied 358 U.S. 834, 79 S.Ct. 56, 3 L.Ed.2d 71.

2. It is conceded by the Commissioner that K-U is entitled to a deduction of $127,383.28 for the total amount of dividends paid on the 6% and 7% preferred stock exchanged for 4¾% preferred

stock, and a deduction of $50,018.18 for the amount of dividends paid on the 6% and 7% stock redeemed. Atlantic City Electric Co. v. United States, supra; Utilities & Industries Corp. v. Commissioner, 41 T.C. 888.

■ 3. K-U is entitled to a deduction under Section 26(h) for the accrued dividends on the 4¾% preferred stock received by shareholders in exchange for 6% and 7% preferred stock in the amount of $101,104.64.

■ 4. K-U is not entitled to a deduction under Section 26(h) for $21,195.74 in accrued dividends on the 32,784 shares of 4¾% preferred stock purchased by the underwriters which accrued from the date of issue to the date of sale and were included in the purchase price paid K-U.

## CONCLUSION

Counsel for the parties will prepare and submit a judgment in accordance with the findings of fact and conclusions of law set forth in this memorandum after a determination is made of the correct amounts of refund, including interest.

The disposition of each of the five issues involved in these actions is summarized as follows:

I  *Depreciation of Land and Flowage Rights*

K-U is entitled to an annual allowance of 1% of the cost of the land and flowage rights, $896,629.27, for the exhaustion of such rights, or a deduction each year in the amount of $8,966.29.

II  *Computation of Excess Profit Credits under Section 448, Internal Revenue Code of 1939*

K-U's claim for refund on excess profit credits was conceded by the Commissioner following the amendment of Treasury Regulations 130, Section 40.448–2(e)(2).

III  *Deductibility of the Pineville Generator Damage*

K-U is entitled to a deduction of $10,000.00 for the year 1953 as a loss not compensated for by insurance or otherwise under Section 23(f) of the 1939 Internal Revenue Code.

IV  *Deductibility of Social Security Taxes*

K-U is entitled to the deduction for social security taxes claimed on its amended returns for the years 1947 through 1951 and its original returns for the years 1952 and 1953.

Old Dominion is entitled to the deduction for social security taxes claimed on its amended returns for the years 1949 through 1951.

V  *Credits under Section 26(h)*

K-U is not entitled to a deduction for the amounts paid as cash premiums on the 6% and 7% preferred stock exchanged or redeemed following the issuance of its new 4¾% preferred stock.

K-U is entitled to a deduction of $127,383.28 for accrued dividends paid on 6% and 7% preferred stock exchanged for 4¾% preferred stock.

K-U is entitled to a deduction of $50,018.18 for accrued dividends paid on 6% and 7% preferred stock redeemed.

K-U is entitled to a deduction of $101,104.64 for accrued dividends paid on 4¾% preferred stock issued in exchange for 6% and 7% preferred stock.

K-U is not entitled to a deduction of $21,195.74 for accrued dividends included as a part of the purchase price of the 32,784 shares of 4¾% preferred stock bought by the underwriters.