**UNITED STATES of America,**
Appellant,

v.

**WEBER PAPER COMPANY, Appellee.**

**No. 17162.**

United States Court of Appeals
Eighth Circuit.

July 26, 1963.

George A. Hrdlicka, Atty., Dept. of Justice, Washington, D. C., for appellant; Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Lee A. Jackson, Robert N. Anderson, Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., and F. Russell Millin, U. S. Atty., and William A. Kitchen, Asst. U. S. Atty., Kansas City, Mo., on the brief.

John B. Gage, Kansas City, Mo., for appellee; Elmer B. Hodges of Gage, Hodges, Moore, Park & Kreamer, Kansas City, Mo., on the brief.

Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District Judge.

SANBORN, Circuit Judge.

This is an appeal by the United States from a judgment for a taxpayer (appellee) in an action for the refund of corporate income tax deficiencies alleged to have been erroneously assessed and collected for the calendar years 1956, 1957 and 1958. The action was brought after timely claims for refund had been denied. The deficiency in each of the years was based upon the disallowance by the Commissioner of Internal Revenue of the major portion of a deduction taken by the taxpayer of an amount claimed by it to be a premium paid for flood insurance coverage on its business property, and therefore deductible as a business expense under Section 162(a) of the Internal Revenue Code of 1954, 26 U.S.C. 1958 ed. § 162(a),[1] and Treasury Regulations.[2]

The evidentiary facts out of which this controversy arose are not in dispute. The sole issue was and is that of the deductibility under § 162(a) of the amounts paid as premium deposits to National Flood Underwriters, a reciprocal or inter-insurance exchange, for flood insurance. The trial court's detailed Findings of Fact and Conclusions of Law are published in 204 F.Supp. 394. They sustain the judgment appealed from. The Government does not challenge the court's findings of the basic facts, but contends that the judgment is based upon a misapplication of the law to such facts.

The taxpayer, as its name indicates, is a dealer in paper and paper products. It is located in a rented building in a low-lying area in Kansas City, Missouri, near the confluence of the Kansas (Kaw) and Missouri rivers. The area, known as Central Industrial District, was seriously inundated in the floods of 1903 and 1951.

---

1. "§ 162. *Trade or business expenses.*
   "(a) *In general.*—
   "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *."

2. Treasury Regulations on Income Tax (1954 Code):
   "§ 1.162–1. *Business expenses.*
   "(a) *In general.* Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayers' trade or business, * * *. Among the items included in business expenses are management expenses, commissions * * *, labor, supplies, incidental repairs, operating expenses of automobiles used in the trade or business, traveling expenses while away from home solely in the pursuit of a trade or business * * *, advertising and other selling expenses, together with insurance premiums against fire, storm, theft, accident, or other similar losses in the case of a business, and rental for the use of business property. * * *"

In the flood of 1951, damage to the inventory of the taxpayer amounted to $90,000. As a result of the serious flood losses suffered by the taxpayer and others, a demand for flood insurance protection arose. None was available. Existing insurance carriers concluded that such risks could not soundly be underwritten, due to their nature and the limited demand for such insurance. Congress undertook to solve the problem by enactment of the Federal Flood Insurance Act of 1956, 70 Stat. 1078, 42 U.S.C. 1958 ed. § 2401 et seq. This Act contemplated federal and state participation in providing for the necessary reserves. Nothing came of it.

Finally it was suggested by a Kansas City Chamber of Commerce group that flood insurance might be furnished under a reciprocal or inter-insurance plan to be financed by those exposed to the risk of flood damage. The National Flood Underwriters (National) was organized under the laws of Missouri relating to reciprocals or inter-insurance exchanges.[3] 19 V.A.M.S. §§ 375.790 to 375.920. National was, in July of 1957, authorized by the State of Missouri to write fire, allied lines, and flood insurance on the reciprocal or inter-insurance plan. In 1958 it was similarly licensed by the State of Kansas. Flood Insurance Associates, Inc., a Missouri corporation organized in December 1955, was designated Attorney-in-Fact for the subscribers for insurance in National, of which there were a substantial number, including the taxpayer.

Prior to the organization of National Flood Underwriters, Mr. John B. Gage— one of the counsel for the appellee in this case—as attorney for the Wilweb Investment Company, which owns the building occupied by the taxpayer, undertook to procure a ruling from the Commissioner of Internal Revenue as to whether annual premium deposits proposed to be made by Wilweb, a subscriber to the inter-insurance plan, would be deductible as a business expense under the Internal Revenue Code. The response of the Commissioner, dated July 24, 1956, is set forth in the margin.[4] A similar

---

3. A reciprocal or inter-insurance exchange may be said to be an aggregation of persons, called subscribers, who, through an attorney-in-fact, cooperate to furnish themselves and each other insurance against a designated risk. The subscribers are both the insured and the insurers. See *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 314–315, 63 S.Ct. 602, 87 L.Ed. 777, 145 A.L.R. 1113, 1117; 18 Appleman, Insurance Law and Practice, § 10121, pages 224–226.

4. "U. S. Treasury Department
　　　　Washington 25
　"Office of
Commissioner of Internal Revenue

　"Address Reply to
Commissioner of Internal Revenue
　Washington 25, D. C.　　JUL 24 1956
　And Refer To
　　T:R:C
　　JCH
"Mr. John B. Gage
"1007 Bryant Building
"Kansas City, Missouri
　"In re: Wilweb Investment Company
　　　　Kansas City, Missouri
"Dear Mr. Gage:
　"This is in reply to your letter of July 9, 1956, with which you enclosed a letter dated July 10, 1956, from the above-named company requesting a ruling as to whether the annual premium paid by such company to Flood Insurance Associates, Inc., as attorney in fact for National Flood Underwriters, would constitute a deductible expense for Federal income tax purposes during its current taxable year.

　"The facts as stated in the company's letter and the enclosed supporting documents are briefly summarized as follows:

　"Flood Insurance Associates, Inc., a Missouri corporation, will act as attorney-in-fact for a proposed reciprocal insurance exchange, National Flood Underwriters to be incorporated under the laws of the States of Missouri and Kansas.

　"Application will be made by Wilweb Investment Corporation to Flood Insurance Associates, Inc., for flood insurance in the total amount of $50,000 to be written over a ten-year period, $5,000 as a premium deposit for coverage to be effective for the first policy year and the coverage to be increased by a premium deposit of $5,000 per year until it reaches $50,000.

　"The premiums of Wilweb Investment Company together with those of other prospective subscribers will be deposited in escrow with the Riverview State Bank

ruling was obtained by the Real Estate Corporation, Inc., of Kansas City, Kansas, another subscriber, by letter dated January 27, 1958. By a letter of June 15, 1959, from the United States Treasury Department, Senator Byrd, Chairman of the Committee on Finance of the United States Senate, was advised that proposed legislation to amend § 162 of the Code so as to expressly provide that "amounts paid or accrued for premiums for insurance against losses arising from floods" were deductible under that section, was unnecessary, since "the existing statute and the regulations issued thereunder appear to be sufficiently clear with respect to the deductibility of premiums paid for flood insurance."

On June 20, 1956, the taxpayer made application to National "for $100,000 of flood insurance to be written over a ten year period, 10%, or $10,000, to become effective when policy is issued and delivered," and at the same time executed a "Subscriber's Agreement" with National, appointing Flood Insurance Associates, Inc., as the taxpayer's attorney-in-fact to exchange insurance with other subscribers against flood losses. The taxpayer tendered $1,000 with the application, being 10% of the first annual premium deposit required. The balance of the $10,000 premium deposit was paid when National had been licensed to write flood insurance and had issued Policy No. 102 to the taxpayer. In August 1958 an additional $10,000 premium deposit was made by the taxpayer, thereby increasing the flood insurance coverage under Policy No. 102 to $20,000.

The Superintendent of the Insurance Division of the State of Missouri required the constant maintenance of reserves against flood insurance losses underwritten by National, equal to the face amount of all flood policies in force. This requirement was imposed because of the nature of the risk involved. The entire premium deposit of a subscriber was required to be credited on the books of National to the Catastrophe Loss Account of the individual subscriber. This account was subject to pro-rata charges for flood losses, if any. The attorney-in-fact debited the account with an amount equal to 1% of the insurance coverage. This amount was referred to in the Subscriber's Agreement as credited to annual premium and was a General Reserve Fund which was subject to being used in payment of losses if the Catastrophe Loss Account became exhausted.

Net credits in the Catastrophe Loss Account and the General Reserve Fund were to be invested by the Attorney-in-Fact as directed by an Investment Committee appointed by an Advisory Committee selected by the subscribers and the Attorney-in-Fact, so as to produce investment income. Investment earnings

of Kansas City until incorporation of National Flood Underwriters.

"The full amount of the premium deposit will be credited to a Catastrophe Loss Account with a portion designated as a General Reserve Fund, and the right of assessment in the amount of one additional annual premium will be included in the subscriber's agreement. Furthermore, such agreement will contain provisions for withdrawal of the company's credit balance in the Catastrophe Loss Account upon 60 days' notice and investment credits to the company's Individual Surplus Account upon 30 days' notice.

"In submitting your request for a ruling assumption is made by the company that the form of the subscribers' agreement and the plan of organization of the reciprocal insurance exchange have been tentatively approved and that any deduc-

tion claimed in a taxable year will relate only to the extent that the premium deposit is applicable to such year.

"Based upon the information contained in the letter from Wilweb Investment Company, with enclosures, and the assumptions made therein, it is held that the annual premium paid by such company will constitute a deductible expense for Federal income tax purposes to the extent that it is applicable to flood insurance in force and effect during the current taxable year in accordance with the provisions of section 162 of the Internal Revenue Code of 1954. Any withdrawals representing refunds of portions of the premiums paid would, of course, represent income in the year received.

"Very truly yours,
"/s/ T. EDELSCHEIN
"Chief, Corporation Tax Branch"

at the end of each fiscal year were to be credited to the Catastrophe Loss Account and the General Reserve Fund, but were subject to deduction for the expenses of operation of National and the compensation of the Attorney-in-Fact. During the years in suit there were no investment earnings to be credited to the account of the taxpayer.

The flood risk assumed by National was not reinsured. No reinsurance was available. No flood losses were incurred during the taxable years in suit nor have any occurred since.

Subscribers of National for flood insurance were classified according to their location. The Attorney-in-Fact was given the right to call on each subscriber for an amount not in excess of the "annual premium" to pay excess losses. This is a requirement of both Missouri and Kansas statutes.

We quote the following pertinent provisions of the Subscriber's Agreement, which is, of course, a part of the policy contract:

"3. Said Attorney [Attorney-in-Fact] shall have no power to make us [Weber Paper Company, subscriber] jointly liable with any other subscriber and every liability of whatsoever nature which said Attorney is authorized to incur for us hereunder is to be in every case several and not joint. Our said Attorney shall not have power to bind us for the obligation of any other subscriber, but is hereby given power only to bind us severally and for ourselves alone. A separate individual account shall be kept by our Attorney with us and with each other subscriber.

\* \* \* \* \* \*

"5. Our Attorney shall collect from us annually a premium deposit, the amount of which shall not be in excess of the amount of additional insurance coverage applied for and placed in effect in the year to which such payment applies. The full amount of such premium deposit, when and as made, shall be credited to our Catastrophe Loss Account. Our Attorney shall debit each year in which an Annual Premium deposit is made, such account, with an Annual Premium equal to one per cent (1%) of the amount of our insurance coverage currently in effect. Our Annual Premium shall be credited to and placed in and become a part of a General Reserve Fund held for and under the provisions hereof applicable to risks of similarly classified subscribers whose insured properties or businesses are located in the same flood district as our own.

"6. Funds constituting net credits or balances in our Catastrophe Loss Account and in the General Reserve Fund shall be invested from time to time by our Attorney acting under the direction and supervision of an investment committee appointed by the Advisory Committee. For the purposes of investment, our funds, together with those of all other subscribers, shall constitute a common fund. Our Catastrophe Loss Account and the General Reserve Fund in which we are interested shall share pro rata with other subscribers' funds in the earnings from the investment of such common funds.

"7. Our Attorney shall debit our Catastrophe Loss Account with our pro rata share of the payment of adjusted flood losses incurred by such similarly classified subscribers in the event flood loss or damage should occur within the policy coverage of such subscribers and with the cost of the purchase of reinsurance, if any, for us.

"Balances in the General Reserve Fund hereinbefore referred to shall be held exclusively for the payment of such flood loss and damage claims in excess of our Catastrophe Loss Account, and for the expense of adjusting such flood loss and damage claims, the cost of such reinsurance, and the payment of a pro rata share of license fees and taxes applicable

to or arising from the insurance of the risks of such subscribers. Our said Attorney, with the consent of the Advisory Committee, shall have the power to call on us for an amount not exceeding one Annual Premium to pay excess losses incurred under this contract and we hereby agree to pay not exceeding such amount on call.

"Our Attorney is authorized to deduct on a pro rata basis from our accumulated investment earnings, amounts not in excess of one per cent (1%) of such Annual Premium deposits for collection expense, legal fees, Advisory Committee expense, and Investment Committee expense, including salaries, commissions and fees necessary to the proper investment of funds, all as authorized by the Advisory Committee.

\* \* \* \* \* \*

"10. The credit balance in our Catastrophe Loss Account shall not be withdrawn by us except upon sixty (60) days prior written notice effective immediately after the end of our current policy year. In the event of withdrawal, our credit in this account will be adjusted to reflect the then average market value of investments owned by the exchange.

\* \* \* \* \* \*

"13. This agreement is strictly limited to the uses and purposes herein expressed and may be terminated at any time by the undersigned or by the Attorney, by either giving the other five days' notice in writing. Our liability created by virtue of this instrument shall begin and end simultaneously with liability of other subscribers to us and no liability shall accrue against us hereunder after termination."

The policy itself contains a provision reading as follows:

"*Cancellation of policy.* This policy shall be cancelled by the insured or by the Company by either giving the other five days' notice in writing."

In view of the provision of the Subscriber's Agreement and of the policy relating to the termination of the subscriber's liability as an insurer and the provision enabling the subscriber to recapture 99% of the subscriber's annual premium deposit at the end of a policy year on 60 days' notice, one can understand why it is contended by the Government that the taxpayer, as a subscriber, did not, as a practical matter, lose control of its premium deposits, and that it was using National as a convenient depositary for a contingency reserve, instead of retaining the amount of the reserve in the subscriber's own bank account or on its books. Compare, Consumers Oil Corporation of Trenton, N. J. v. United States (D.C.N.J.), 188 F. Supp. 796.

Moreover, some irregularities in the administration of National by the Attorney-in-Fact, with respect to the withdrawal of some of the Catastrophe Loss Accounts of some subscribers prior to the end of a policy year, and in accepting assignments, made by subscribers, of such accounts as collateral for loans, subject, however, to the terms of the policy, lend some support to the Government's contention that the taxpayer never realistically lost control of its premium deposits. Concededly, however, those who promulgated and promoted this flood insurance plan were acting in entire good faith.

■ As we have already stated, the trial court's findings of fact and conclusions of law support its judgment. Obviously, National was a legitimate insurer of flood risks. The premium payments which the taxpayer made for flood insurance were payments which it was required to make to obtain the protection desired and applied for. The applicable Treasury Regulations made "insurance premiums against fire, storm, theft, accident, or other similar losses," in connection with the conduct of a business, deductible under § 162(a) of the

1954 Code. An insurance premium is, as a matter of common knowledge, what one pays or agrees to pay an insurer for protection against a designated loss. There is no contention that, as a general rule, premiums paid for flood insurance are not deductible. The contention is that the premium deposits made by this taxpayer under this particular plan of inter-insurance were, under all the circumstances, not such insurance premiums as constituted ordinary or necessary business expenses within the meaning of § 162(a) and the applicable Regulations. In reaching the conclusion that the District Court was justified in determining that the premium deposits in suit were deductible, we have placed no reliance on the letter opinions of the Commissioner of Internal Revenue to which we have referred in this opinion.

The judgment appealed from is affirmed.