Henry L. and Frances O. HILLS, Respondents,

v.

COMMISSIONER OF INTERNAL REVENUE, Petitioner.

No. 81–7668.

United States Court of Appeals, Eleventh Circuit.

Nov. 15, 1982.

Rehearing and Rehearing En Banc Denied Jan. 17, 1983.

John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Robert T. Duffy, William P. Wang, Attys., Appellate Section, U.S. Dept. of Justice, Washington, D.C., for petitioner.

Hicks, Maloof & Campbell, Bruce M. Edenfield, Atlanta, Ga., for respondents.

Before HILL and HATCHETT, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

GOLDBERG, Circuit Judge:

Section 165 of the Internal Revenue Code of 1954 allows, as a general rule, deductions for "losses ... not compensated for by insurance or otherwise."[1] In this appeal we are presented with a question of first impression in this circuit; we are called upon to decide whether a voluntary election not to file an insurance claim for a theft loss precludes a casualty loss deduction under this section.

## I. INTRODUCTION

### A. Facts

Henry and Frances Hills, taxpayer-appellees, own a vacation home near Dahlonega, Georgia. About April 1, 1976, a thief disturbed the solitude of their secluded retreat, causing a loss of $760. Though the loss was insured, the taxpayers chose not to file a claim under their policy.[2] Instead, the taxpayers claimed a casualty loss deduction on their 1976 federal income tax return.[3]

### B. Procedural History and Decision Below

The taxpayers' return was audited and the Commissioner issued a Notice of Defi-

---

\* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Internal Revenue Code of 1954 (26 U.S.C.):
   SEC. 165. LOSSES.
   (a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
   \*    \*    \*    \*    \*    \*
   (c) *Limitation on Losses of Individual.*—In the case of an individual, the deduction under subsection (a) shall be limited to—
   (1) losses incurred in a trade or business;
   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and
   (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. \* \* \*

2. For the idly curious reader, the taxpayers apparently declined to pursue a claim because: (1) they had previously filed three other theft claims and feared a fourth would result in cancellation of the policy; (2) the same policy also included their fire protection; (3) because of the distance of their country home to the nearest fire station, it would be difficult if not impossible to get other fire coverage. These facts, though of interest, are not pertinent to our holding.

3. The claimed deduction was for $660 rather than $760, because § 165(c)(3) allows deduction for losses only to the extent they exceed $100.

ciency. The taxpayers, now aggressively trying to prevent economic loss, appealed to the Tax Court. This was also a case of first impression for the full Tax Court.[4] In a fine, thoughtful opinion reviewed by the full court,[5] Judge Nims diverged from prior judicial treatment and allowed the deduction.[6] The Tax Court assumed the existence of a loss and dealt primarily with whether the loss was compensated by insurance or otherwise within the meaning of section 165(a). Relying on the clear statutory language and limited legislative history, the court held the taxpayers' loss was not compensated. The court further held that this loss was not caused by the taxpayers' election not to file an insurance claim, and so was not precluded by the limitations on deductions for personal, nonprofit-seeking losses contained in section 165(c).[7] We affirm.

## C. Arguments on Appeal

On appeal the Commissioner strongly urges that section 165 calls for a two-part analysis: one must first determine if there has been a loss, and only then consider whether the loss has been compensated by insurance or otherwise.[8] The Commissioner does not deny the Tax Court's view that the economic detriment here was not compensated by insurance or otherwise; rather, he claims that these facts do not meet the first statutory requirement of a loss.

The Commissioner advances three arguments for the position that the taxpayers did not suffer a deductible loss. First, he argues that section 165(a) requires a taxpayer to pursue all reasonable possibilities of recompense before an economic detriment is considered a loss. Because the taxpayers did not file an insurance claim, they did not undergo a loss. Second, he revives the argument rejected by the Tax Court that this loss was caused by the taxpayers' election not to file a claim, and so is not a personal loss of the sort section 165(c) makes deductible. Finally, the Commissioner argues that the economic detriment suffered by the taxpayers was in substance

---

**4.** In an earlier case, *Axelrod v. Commissioner,* 56 T.C. 248 (1971), the majority of the Tax Court found it unnecessary to pass on the deductibility of uncompensated insured losses. Two judges concurring separately, however, did reach the issue. Judge Quealy would not have allowed such a deduction on two grounds. First, by failing to file a claim, the taxpayer "had no casualty loss in 1965 which was 'not compensated' or 'made good' by insurance within the meaning of the statute and [the Commissioner's] regulations." *Id.* at 261 (Quealy, J., concurring). Second, "[a]ny loss sustained by the petitioner resulted from his election not to claim compensation rather than from the casualty loss not being compensated for by insurance." *Id.* at 263 (Quealy, J., concurring). Judge Fay would have allowed the deduction "where the taxpayer has, for valid practical reasons, relinquished his rights to claim compensation from the insurance company," because "[u]nder these circumstances, such an individual is for all practical purposes without insurance."

**5.** Reported below at 76 T.C. 484 (1981). The Tax Court decision has already sparked some scholarly commentary. *See* Tripp & Vogel, *Unreimbursed Casualty Losses After* Hills, 60 Taxes 154 (1982).

**6.** The first case squarely denying a deduction for an uncompensated, insured loss was *Kentucky Utilities Co. v. Glenn,* 394 F.2d 631 (6th Cir. 1968). Subsequent courts have followed what we consider an undesirable view of *Kentucky Utilities. See, e.g., Waxler Towing Co. v. United States,* 510 F.Supp. 297 (W.D.Tenn. 1980); *Bartlett v. United States,* 397 F.Supp. 216 (D.Md.1975); *Morgan v. Commissioner,* 37 T.C.M. (CCH) 524 (1978) (following *Kentucky Utilities* under the *Golsen* rule, *Golsen v. Commissioner,* 54 T.C. 742, 757 (1970), *aff'd,* 445 F.2d 985 (10th Cir.), *cert. denied,* 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971)). *See also* Case Comment, Bartlett v. United States: *Deduction of Nonbusiness Losses not Compensated by Insurance—The Need for a Separate Standard for Individuals,* 18 Wm. & Mary L.Rev. 200 (1976). In *Miller v. Commissioner,* 41 T.C.M. (CCH) 528 (1980) the Tax Court followed *Kentucky Utilities* under the *Golsen* rule, but then withdrew its opinion in light of *Hills* below. 42 T.C.M. (CCH) 665 (1981). That has been appealed to the Sixth Circuit, No. 81–1717 (6th Cir. Nov. 10, 1981). We disagree with these subsequent courts' interpretation of *Kentucky Utilities. See infra* Part III.B.

**7.** Four judges dissented on this ground. 76 T.C. at 492 (Sterrett, J., dissenting).

**8.** This two-part analysis first appeared in Judge Quealy's concurrence in *Axelrod. See supra* note 4; Tripp & Vogel, *supra* note 5, at 156–57.

nothing more than a nondeductible insurance premium. We shall review the Tax Court's holding regarding compensation, and then consider each of the Commissioner's arguments in turn.

## II. "COMPENSATED" DOES *NOT* MEAN "COVERED"

Section 165(a) allows a deduction for any "loss . . . not compensated for by insurance or otherwise." The plain language of the statute presents a two-part inquiry: (1) Was there a loss?; (2) Was it compensated for by insurance or otherwise? Although the Commissioner does not now rely on any strained gloss on "compensated," we consider that now for two reasons. First, understanding the meaning and history of the compensation half of section 165(a) is necessary to understand the loss half. Second, some courts prior to the Tax Court below have relied on an unusual view of the word.[9]

■■■ "Compensated" is a respectable, everyday English word with a respectable, everyday meaning. Absent unusual circumstances we are bound by the plain meaning of the language Congress has enacted.[10] "Compensated" here seems quite able to take its everyday meaning of being reimbursed. Indeed, the Commissioner's regulations support and endorse this common-sense construction.[11]

The disposition the Commissioner favors in this case would deny a section 165 deduction any time a loss is covered by insurance. This is functionally equivalent to reading the statute as if it said "not *covered* by insurance." It is sufficient to point out that "covered" also has a plain meaning rather different from that of "compensated," and that this Court must enforce the statute Congress actually enacted. If that were not sufficient response, the small fragment of legislative history on this section surely is dispositive.[12] The initial House Ways and Means Committee language was "losses . . . not covered by insurance or otherwise and compensated for." The Senate Finance Committee amended the language to its final and enacted form of "losses . . . not compensated for by insurance or otherwise."[13] This change makes clear the fact that Congress was aware of the difference between "covered" and "compensated" and intended to enact what it in fact enacted.

## III. AN UNCOMPENSATED LOSS IS STILL A LOSS

### A. *The Closed and Completed Transaction Doctrine Does Not Impose a Duty to Pursue Compensation*

■■ Section 165(a) allows a deduction for an economic detriment that (1) is a loss, and (2) is not compensated for by insurance or

9. *See, e.g., Broderick v. Anderson,* 23 F.Supp. 488, 492 (S.D.N.Y.1938) ("No force can be given to plaintiff's claim that 'not compensated by insurance' does not mean 'not covered by insurance.' It means that or it is meaningless.").

10. *See, e.g., City of Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980); *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625–26, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). *But see* Note, *Intent, Clear Statements, and the Common Law: Statutory Interpretation in the Supreme Court,* 95 Harv. L.Rev. 892 (1982) (arguing courts should feel free to treat old statutes as common law precedent).

11. *See* Treas.Reg. § 1.165–1(a) (deduction allowed for any loss "not made good by insurance"); *id.* § 1.165–1(c)(4) (amount of loss allowed should be adjusted by "insurance . . . received").

12. The language of this section was originally enacted in § 28 of the Revenue Act of 1894. Pub.L. No. 227, ch. 349, 28 Stat. 509, 553. This particular act was held unconstitutional in *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895), but the relevant language was reenacted without relevant change or comment and now appears in I.R.C. § 165.

13. *See* J. Seidman, *Seidman's Legislative History of Federal Income Tax Laws, 1938–1861,* at 1018 (1938). There was no Finance Committee report for this bill. *See also* Comment, *Theft Loss Deductions as Relief for the Small Investor,* 1978 Duke L.J. 849, 860–61 & nn. 67, 68 (discussing and citing sources for limited legislative history of § 165(c)(3)).

otherwise. The Commissioner does not now make a frontal attack on the taxpayers' position by attempting to argue pointlessly that the economic detriment was compensated. Rather, he makes a flanking attack and argues that the detriment was not a deductible loss.

The Commissioner's first argument relies on the rule that a loss must be represented by a closed and completed transaction to be deductible. He argues that this requirement means a taxpayer must reasonably pursue *all* possible sources of recovery before an economic detriment is a deductible section 165(a) loss. In support of his position the Commissioner cites *Alison v. United States,* 344 U.S. 167, 73 S.Ct. 191, 97 L.Ed. 186 (1952). In *Alison,* the Supreme Court noted that a theft loss is not sustained when embezzlement takes place because "[o]ne whose funds have been embezzled may pursue the *wrongdoer* and recover his property wholly or in part." *Id.* at 170 (emphasis added). *See also* Treas.Reg. § 1.165–1(d) (timing of deduction depends on evidence of "closed and completed transaction;" no loss sustained while "there exists a claim for reimbursement with respect to which there is a reasonable prospect for recovery").[14] We note in passing that the authority the Commissioner cites all relates to *timing* of a loss deduction.

The problem with this argument lies in the two-part nature of the transaction. Congress has divided the transaction into loss and compensation, and just as "compensation" has a clear meaning, "loss" also has a clear meaning different from that the Commissioner proposes. It is plain that if a

person takes your property and returns it, no loss has taken place. It is equally plain that if an unknown person takes your property and destroys it, a loss has taken place. There are many shades between these two extremes; however, the line-drawing problem of determining precisely when there is a loss is not before us.

That line-drawing problem is not before us now because it is clear the taxpayers have had a loss; a thief in the night has spirited away their property, which has not subsequently been recovered. Even though the loss might later be compensated by an unrelated third-party "insurer or otherwise" a loss has still been suffered. The distinction between the two phases of loss and compensation is mandated by the statutory language. The distinction between possible recovery from principals in the loss phase [15] and possible recovery from unrelated third parties in the compensation phase is also mandated by the statutory language. It refers to "losses ... compensated for by *insurance or otherwise.*" Thus a potential for recovery from an indemnificator must be treated as part of the compensation phase.[16] Accordingly, the Commissioner's argument that the timing requirement of a closed and completed transaction imposes a duty on the taxpayer to prevent a loss is misdirected because we are now concerned with the compensation half of the transaction. The Commissioner does not attempt to extrapolate a duty to pursue compensation; to do so would be to run afoul of the clear statutory language discussed in Part II, *supra.*[17]

---

**14.** The Commissioner also cites as related authority the requirement under § 166 that a creditor reasonably pursue a debtor before a debt is deductible as a bad debt. *See, e.g., Southwestern Life Ins. Co. v. United States,* 560 F.2d 627, 643–44 (5th Cir. 1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978) (obligations are not deductible bad debts merely because creditor elects not to enforce obligations).

**15.** This seems to be the concern in *Alison, supra,* 344 U.S. at 170, 73 S.Ct. at 192.

**16.** We need not determine in great detail now when a party is a principal to the loss transac-

tion or when a party is an unrelated, third-party indemnificator. The relevant entity in this case is an insurer and clearly in the second category. Presumably a court addressing the precise scope of "insurance or otherwise" would apply the doctrines of *ejusdem generis* and "deductions are a matter of legislative grace" and use a narrow construction.

**17.** *Cf. Ramsay Scarlett and Co. v. Commissioner,* 61 T.C. 795 (1974), *aff'd,* 521 F.2d 786 (4th Cir. 1975) (taxpayer has duty to pursue right of recovery under U.C.C. against bank honoring embezzler's checks before loss from embezzlement is sustained).

Moreover, the Commissioner's definition of loss renders the second "and not compensated" clause surplusage. According to the Commissioner, to the extent there is even a reasonable *possibility* of compensation, there is no loss. Thus, an economic detriment that was *in fact* compensated is certainly not a loss. That would mean that *definitionally* all deductible losses are not compensated, so Congress wasted energy and ink by limiting deductions to losses not compensated for by insurance or otherwise. We are loathe to ascribe such foolishness to Congress, particularly when a common-sense interpretation based on the plain meaning of the words would avoid the insult.[18]

Although the Commissioner does not *directly* argue that "compensated" should not take its natural meaning, we are urged to read section 165 of the Code *as though* its simple, uncomplicated words are either abstruse or arcane. We have followed the philological arguments tarrying here and there for a minute examination of the etymolog: of "compensated" and "covered" and conclude that there is not a scent of symbiosis between the two, no similarities or similitude except for a vowel here and a consonant there. There is not a syllable of legislative history that justifies even a vague inference that the Congress in using the word "compensated" intended to use the word "covered," while the plain, unvarnished truth is that the enactment carries the convincing words that the deduction is predicated upon whether or not the taxpayer was compensated for the loss.

### B. A Two-Part Transaction View of Kentucky Utilities

In *Kentucky Utilities Co. v. Glenn,* 394 F.2d 631 (6th Cir. 1968), one view of the bottom line is that an economic detriment suffered by a taxpayer, which is covered by insurance but not compensated by insurance, is not a serious § 165 loss.[19] The Tax Court below felt that due to the factual complexity of *Kentucky Utilities,* this simplistic, bottom-line view was an inadequate

---

**18.** In support of the Commissioner's definition of loss, he cites to Treas.Reg. § 1.165–1(d), dealing with *timing* of the deduction. Though we reject this position, this section of the regulations raises the issue of when it is clear a loss is not compensated. Sec. 1.165–1(d)(2) provides:

> (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having

> abandoned the claim, such as the execution of a release.
> (ii) If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. * * *
> (iii) If the taxpayer deducted a loss in accordance with the provisions of this paragraph and in a subsequent taxable year receives reimbursement for such loss, he does not recompute the tax for the taxable year in which the deduction was taken but includes the amount of such reimbursement in his gross income for the taxable year in which received, subject to the provisions of section III, relating to recovery of amounts previously deducted.

It would seem that under these regulations what the Hills have done is to abandon their claim for reimbursement against their insurer. The Commissioner has not objected to the absence of "objective evidence" of the abandonment, such as a release or affidavit. Presumably if the Hills subsequently recovered under their insurance, § 1.165–1(d)(iii) would govern the reimbursement.

**19.** *See* cases cited *supra* note 6.

expression of the holding.[20] Of course the Eleventh Circuit is not bound by *Kentucky Utilities.* Given the importance of that case in subsequent decisions, however, we pause to express our agreement with the Tax Court that the result in the instant case is not inconsistent with a two-part transaction view of *Kentucky Utilities.*

The utility ("K–U") had a generator supplied by Westinghouse, which in 1951 was damaged for a loss of $147,537.60. Westinghouse investigated the accident and was convinced that it was not liable for the loss under its warranty. K–U valued its business relations with Westinghouse and did not want to jeopardize them through litigation. K–U had $10,000.00 deductible insurance coverage with Lloyds of London, which did not contest its liability under the policy. However, Lloyds insisted upon its right of subrogation and would have pursued Westinghouse had it paid K–U on the claim.[21] In 1953 the parties reached a settlement in which the loss was divided; Westinghouse paid $65,550.93, Lloyds paid $37,500.00, and K–U paid $44,486.67. The district court made the following findings of fact:

> 6. For business reasons, K–U did not want any litigation brought against Westinghouse. Moreover, because of possible difficulty in retaining insurance of this character on its equipment, K–U did not want Lloyds to pay all of the loss except the $10,000.00 deductible under the policy.
>
> \*   \*   \*   \*   \*   \*
>
> 8. K–U voluntarily assumed $34,-486.67 of the cost of repairs to the generator to protect Westinghouse from suit by Lloyds and to avoid difficulty in obtaining insurance with Lloyds. The expenditure of $34,486.67 in this manner does not constitute a loss or an ordinary and necessary business expenditure.

*Kentucky Utilities Co. v. Glenn,* 250 F.Supp. 265, 270 (W.D.Ky.1965).

In its conclusions of law the district court first noted that, in accord with the closed and completed transaction doctrine, no loss of any kind was suffered in 1951. The court then found that only $10,000.00, the deductible amount, was a loss "because K–U's claim against Lloyds was not in dispute. K–U is not entitled to a deduction of $34,-486.67 as a loss not compensated for by insurance or otherwise under [the predecessor of section 165(a)]." 250 F.Supp. at 271. Finally, the district court found that this was not an ordinary and necessary business expense.

The Sixth Circuit sustained the district court regarding the generator loss. First it quoted the two findings of fact that we have quoted. Then it stated: "This record convinces us that the District Judge's quoted findings of fact are not clearly erroneous. K–U's loss over and above the $10,000 allowed by the District Judge was not an 'uninsured loss.' *Sam P. Wallingford Grain Corp. v. Commissioner of Internal Revenue,* 74 F.2d 453 (10th Cir. 1934)." *Kentucky Utilities,* 394 F.2d at 633. The court then upheld the finding that the assumption was not an ordinary or necessary business expense. This is the entire section of the opinion dealing with the loss.

The Sixth Circuit was perhaps more terse than we, in retrospect, would wish. We have quoted at length from the district court opinion because the significant differences between that and the Sixth Circuit's opinion help illustrate our view that the Sixth Circuit was in fact using a two-part transaction analysis. The district court explicitly based its conclusion of law that this was not a deductible loss not compensated for by insurance on the undisputed nature of the claim against Lloyds. The Sixth Circuit accepted the findings of fact as not clearly erroneous, but instead made alternative conclusions of law, thus implicitly rejecting the district court's conclusion of law.

**20.** In *Miller v. Commissioner,* 42 T.C.M. (CCH) 665 (1981), *appeal docketed,* No. 81–1717 (6th Cir. Nov. 10, 1981), a case factually closer to *Hills* than *Kentucky Utilities,* the Tax Court again expressed its opinion that *Kentucky Utilities* was not controlling. *Id.* at 667.

**21.** K–U was also concerned about possible difficulty in retaining insurance.

The Sixth Circuit's affirmative theory of law is hinted at by the citation of *Wallingford*. *Wallingford* is a bad debt case dealing with a creditor's duty reasonably to pursue a debtor prior to deducting the bad debt. Holding the transaction was not a loss, followed by a cite to *Wallingford*, shows that the Sixth Circuit was concerned with reasonably pursuing a principal to a loss transaction before a loss is sustained.[22]

Our view of *Kentucky Utilities* is that the Sixth Circuit agrees with us that section 165 calls for a two-part inquiry, first into loss, then into compensation. They, unlike us, were interested in the loss half of the transaction,[23] and were directly addressing the scope of the duty reasonably to pursue the principal to a loss transaction.[24] K–U chose not to pursue Westinghouse directly; K–U also chose not to claim under its insurance with Lloyds because it did not want to pursue Westinghouse indirectly either. The holding of *Kentucky Utilities*, then, is that the duty reasonably to pursue a principal to a loss transaction also extends to indirect pursuit.[25] This result regarding the loss half of a transaction is not inconsistent with our holding today regarding the compensation half of a transaction.

## IV. THIS LOSS WAS CAUSED BY A THIEF

■ The Commissioner's second argument focuses on the cause of the economic detriment. Unlike deductions for business or profit-seeking losses, personal loss deductions are limited to losses arising from "fire, storm, shipwreck, or other casualty, or from theft." I.R.C. § 165(c)(3). The Commissioner argues that in this case the loss was not caused solely by theft, but was in part caused by the taxpayers' election not to pursue coverage under their insurance policy. Thus, this loss is not deductible under section 165(c)(3).[26]

This position is tenable, however, only when viewing the entire transaction of loss and compensation as a whole. Because we adopt a two-part view of the statute, we also reject this argument. The *loss* was clearly caused by the elusive thief. The *lack of compensation* was caused by the election not to file, but that seems expressly permitted by Congress. To read the statute otherwise would be to rewrite the statute to read "not covered by insurance," a form Congress has rejected.

## V. THE POLICY BEHIND SECTION 165(C)(3), SUCH AS IT IS

■ The Commissioner's final argument forces this Court to inquire into the policy behind section 165. The key fact in understanding this argument is that for an individual, insurance premiums are a nondeductible personal expense, I.R.C. § 262, whereas casualty losses are deductible. The taxpayers here have chosen to pay a casualty loss out of their own pocket in order to prevent their insurance rates from increasing. Thus, says the Commissioner, the money spent was *really* a nondeductible insurance premium.

The basic economic point of this argument is well taken. No substantial econom-

---

**22.** This inquiry is a factual one, and this theory perhaps explains why the absence of a loss was affirmed as a finding of fact under the "clearly erroneous" standard; on any other theory the existence of a loss would be a conclusion of law and subject to a different standard of review.

**23.** This perhaps explains the Sixth Circuit's unusual use of the phrase "uninsured loss," in quotes. 394 F.2d at 633. The district court was precisely interested in whether "compensated" meant "covered," and quoted the statutory language. By declining to use the statutory language or that of the district court, but rather discussing an "uninsured loss," the Sixth Circuit emphasized its interest in the loss half of the transaction.

**24.** That is the kind of issue the Commissioner attempted to raise in Part III, A, *supra,* and as we pointed out there, that issue is not apposite to our present inquiry into the compensation half of the transaction.

**25.** Because the scope of the duty is not before us now, we neither accept nor reject the Sixth Circuit's view of the duty.

**26.** The *reductio ad absurdem* of the Commissioner's argument is that *all* casualty losses are "caused" by the taxpayer's failure to procure insurance or collect on it. That was certainly not what Congress intended.

ic difference exists between paying insurance premiums and paying casualty losses out of pocket as they arise. There is a very strong argument for taxing both situations the same, and in fact, such proposals are regularly made. *See, e.g.,* U.S. General Accounting Office, *The Personal Casualty and Theft Loss Tax Deduction: Analysis and Proposals for Change* (1979) (Pub. no. GGD–80–10); U.S. Treasury, *Blueprints for Basic Tax Reform* (Jan. 17, 1977), *reprinted in* 1 A. Kragen & J. McNulty, *Federal Income Taxation,* 568–69 (3rd ed. 1979).[27] In fact, Congress itself has been very careful to provide for parallel treatment of medical expenses and medical insurance premiums.[28]

However, in the case of personal casualty losses Congress has seen fit to treat out-of-pocket losses differently from insurance coverage for those losses. Thus Congress has, for whatever reason, chosen to focus on the form of payment rather than economic substance.[29] And so the Commissioner's economically correct observation that the Hills have, in effect, paid insurance premiums is of no more tax import than the complementary economically correct observation that all insurance premiums are nothing more than prepaid casualty losses.

A somewhat latent policy argument is that it is hard to believe "Congress intend[ed] section 165(c)(3) to serve as optional insurance coverage for those who suffer property damage but who choose to collect from Uncle Sam rather than their insurance company." *Bartlett, supra,* 397 F.Supp. at 218. Indeed, to believe such a thing goes against all carefully honed judicial instincts of sniffing out tax avoidance motives. However, upon reflection that seems to be exactly the scheme Congress has enacted. It has never been doubted that the taxpayer could prospectively elect to pay nondeductible insurance premiums or deductible casualty losses as they might arise. The language of the statute indicates Congress' deliberate choice to allow that free election after a casualty as well. Nothing suggests that a taxpayer's preliminary election to take out an insurance policy should be binding; [30] the event Congress has focused on and chosen to make significant is whether compensation was actually received.

There is no codal incongruity or discordance in finding a taxable event where a taxpayer claims a deduction in the absence of that which he could have taken but did not take. For example, a creditor who forgives the debt of his debtor vests income for tax purposes in the debtor. *Cf. U.S. v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). Here the insurance might have been collected because the loss was covered; but the fact that it was not collected increases the income of the insurer and permits a correlative deduction on the part of the taxpayer. In fact, this raises

---

**27.** Fortunately it is not necessary to wade into the fray concerning whether the tax base, properly conceived, should allow deductions for casualty losses. *Compare, e.g.,* Andrews, *Personal Deductions in an Ideal Income Tax,* 86 Harv.L.Rev. 309, 331–333 (1972) *with* Kelman, *Personal Deductions Revisited: Why They Fit Poorly in an "Ideal" Income Tax and Why They Fit Worse in a Far From Ideal World,* 31 Stan. L.Rev. 831, 859 n.87 (1979).

**28.** *See* I.R.C. §§ 105(a), 213(a)(1), 213(e)(1)(C); Clark, *The Federal Income Taxation of Financial Intermediaries,* 84 Yale L.J. 1603, 1674 & nn. 262, 263 (contrasting treatment of casualty losses with treatment of medical expenses).

**29.** *Cf. Comar Oil Co. v. Helvering,* 107 F.2d 709 (8th Cir. 1939) (taxpayer with elaborate self-insurance scheme, including prepaid casualty loss accounts in its internal accounting, does not have loss compensated for by insurance or otherwise when it pays for casualty loss out of its prepaid account).

**30.** One factor that might suggest making such an election binding is if it had important tax consequences as part of a congressional scheme. That is the case in the area of medical insurance, where Congress has enacted specific provisions providing parallel treatment of medical insurance. *See supra* note 28. In contrast, under § 165 there are no tax consequences from the election related to Congress' tax treatment of losses. The only tax consequence from the election to insure, deduction of premiums for business or profit-seeking purposes, is part of a distinct congressional plan. We specifically disavow any judgment one way or the other in the medical expense area, and mention this factor only to point out that our holding is based on the unique factors present in the statutory scheme of § 165.

what we believe to be the actual economic substance and tax policy behind section 165. From the perspective of this loss transaction, the insurance contract has transformed the insurer and the insured into a single economic unit. The net worth of this economic unit has been decreased by the amount of the loss, so somewhere in this unit the tax system should allow a deduction. The Commissioner would not allow either the insurer or the insured to take the deduction; that is a senseless policy. On our view, if the insured is not compensated, the insured gets the deduction; if the insurer compensated the insured, the insurer gets the deduction. Symmetry is preserved and the Commissioner collects the revenue to which he is entitled.[31] The point we wish to make is that this election is not an illogical or an alien concept for the Internal Revenue Code.

## CONCLUSION

The historicity of the Code sections under review gives some indication that Congress was concerned with whether or not mere coverage, though uncollected, could justify denying a deduction for a casualty loss. The Congress in its collective wisdom determined that the deduction would be premised upon whether or not the loss was compensated.

"Compensated" is a word distinct from "covered." We do not read the Code as permitting a taxpayer to paper over his loss. The Code does not speak in terms of a right to compensation, it speaks with a clarion sound, with decibels not minimized by a mute, not stifled by a sordino, that in order for the deduction to become viable, the loss must not be compensated. It does not refer to the right to compensation or the failure to exercise the right. It simply says that the taxpayer shall deduct if he has a loss for which he was not compensated. "Compensation" connotes receipt and "not compensated" means not received. Section 165 read in text and in context cannot mean that a taxpayer who could have collected but did not, is not entitled to the deduction.

Motivations, reasons and explanations cannot change the verbiage of the Code and its regulations. The only fact relevant to the decision in this case is whether or not the taxpayer who claims a casualty loss was compensated for his loss. There is no hint in the statute or the Code regarding the function of motivations and purposes in not taking the insurance compensation. The only words in the statute that speak to deductibility inquire whether or not the loss has been compensated. The answer to this inquiry is that this taxpayer was not compensated. The Code looks simply to whether he received or did not receive compensation for his loss.

Congress may at this juncture want to do further investigation and legislation on the subject, but up until the very date of this opinion, the Code stands as it reads. "Perhaps the wisdom we possess today would enable us to do a better job [of lawmaking] than Congress did in [1894], but even if that be true, we have no authority to substitute our views for those expressed by Congress in a duly enacted statute."[32] In section 165 Congress has duly enacted a straightforward method of determining whether losses are deductible. Whether or not that statute implements the tax policy this Court or the Commissioner would prefer is irrelevant. It is neither our duty nor our prerogative to make that which was not compensated into compensation by any legal legerdemain.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

I dissent because I do not believe: "The Code looks simply to whether [the taxpayer] received or did not receive compensation for his loss." Without precedent from any circuit, without consideration of tax policy and the practicalities of real life, and in total disregard of the applicable treasury regulation, the majority reaches the conclusion

---

**31.** *See* Case Comment, *supra* note 6, at 208 n.54.

**32.** *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978).

that "if he didn't receive it—he didn't receive it." The fact that the taxpayer did not seek reimbursement from a willing source is irrelevant in the majority's analysis.

The regulation, section 1.165–1 (26 C.F.R.) provides:

§ 1.165–1 Losses.

. . . .

(d) *Year of deduction.*

(2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release.

. . . .

(3) Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see § 1.165–8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasona-

ble certainty whether or not such reimbursement will be received.

The regulation, which must be given credence by this court, points out that no loss is sustained, for purposes of section 165(a), if there exists a "claim for reimbursement with respect to which there is a reasonable prospect of recovery." Since the taxpayers here had a ripe and good claim for reimbursement, no deduction should have been allowed because no loss was sustained. A theft or casualty simply does not become a loss until all reasonable prospects for recovery have been exhausted. The distinction between an event and a loss has been amply explained in *Alison v. United States,* 344 U.S. 167, 73 S.Ct. 191, 97 L.Ed. 186 (1952). In making the distinction between an embezzlement and a loss, the Supreme Court stated:

> Furthermore, the terms embezzlement and loss are not synonymous. The theft occurs, but whether there is a loss may remain uncertain. One whose funds have been embezzled may pursue the wrong-doer and recover his property in whole or in part. . . . Events in the *Alison* case show the practical value of this recovery. A substantial proportion of the embezzled funds was recovered in 1941, ten years after the first embezzlement occurred. This recovery is ample refutation of the view that a loss is inevitably "sustained" at the very time an embezzlement is committed.
>
> Whether and when a deductible loss results from an embezzlement is a factual question, a practical one to be decided according to surrounding circumstances. *See Boehm v. Commissioner,* 326 U.S. 287 [66 S.Ct. 120, 90 L.Ed. 78].

344 U.S. at 170, 73 S.Ct. at 192. The taxpayers in this case are poorer, not as a result of the theft, but as a result of their decision, made with full knowledge, not to seek reimbursement from the insurance company. The taxpayers suffered no damages. They, in effect, paid damages to their insurance company and thereby caused other taxpayers to finance their "loophole."

There is, however, a more serious reason that I dissent than that stated above. The majority opinion now creates inconsistency within section 165 between corporations, individuals in a "trade or business," or a "profit" making venture, and non-business individuals. The commissioner's position in this case as expressed through the regulation, provides that all taxpayers must pursue readily available remedies. The majority's position, in not requiring taxpayers to pursue remedies, results in giving corporations and individuals in a "trade or business," or a "profit" making venture, a double bite under the tax laws. The business entity deducts the insurance premium and the theft. A non-business individual may only deduct the theft.

While this may be a desirable result as to an individual non-business taxpayer, it should not be a desirable result where the taxpayer is a corporation or an individual engaged in a "trade or business" or a "profit" making venture. In this sense, the majority fails to consider the practical and economic consequences of its decision.

The basis for all decisions regarding the interpretation of section 165(a) is, as mentioned in the majority opinion, *Kentucky Utilities v. Glenn,* 394 F.2d 631 (6th Cir. 1968). Since *Kentucky Utilities,* two cases have followed its lead. *Axelrod v. Internal Revenue Service,* 56 T.C. 248, 260 (Quealy, J. concurring), *Bartlett v. United States,* 397 F.Supp. 216 (Md.1975). Based on these decisions, the Internal Revenue Service promulgated Revenue Ruling 78–141, 1978–1 C.B. 58 and Letter Ruling 8102010, all holding that where a right to an insurance claim is not exercised, the deduction under section 165(a) may be denied. The Commissioner advances the same position here. Because of the great precedential importance placed on *Kentucky Utilities,* it deserves close scrutiny, notwithstanding its age.

*Kentucky Utilities* must be considered in light of two crucial points: (1) *Kentucky Utilities* was decided under the 1939 Code; and (2) the insured in that case was a corporation. The *Kentucky Utilities* case was governed by section 23(f) of the Inter-nal Revenue Code of 1939. The pertinent part read:

(f) Losses by corporations.

"In the case of à corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

26 U.S.C.A. § 23(f) (1952) (Internal Revenue Code of 1939). Under § 23(f), only corporations were allowed to participate in the benefits of this section. Whereas, under § 165(a) and (c)(3), three classes of taxpayers are allowed the benefits accorded by this section: (1) the corporate taxpayer; (2) the individual taxpayer who is engaged in a "trade or business" or a "profit" making venture; and (3) the non-business taxpayer. These distinctions are important because each taxpayer requires different treatment consistent with economic and tax policy considerations of the Code. Given this perspective, a different, or at least a more restrictive holding as applying only to non-business individuals would have been better than that rendered by the majority. Such a holding would accomplish two objectives: (1) it would remain consistent with *Kentucky Utilities,* and (2) it would remain consistent with the economic realities of the Code.

## THE ECONOMIC REALITIES

Under the present Code, as under the 1939 Code, corporations and individuals engaged in a "trade or business" or a "profit" making venture, are allowed deductions for payment of insurance premiums as an ordinary and necessary business expense. *See* I.R.C. § 162 (1954) and I.R.C. § 23(a) (1939); *United States v. Weber Paper Co.,* 320 F.2d 199 (8th Cir. 1963); *Bennett v. Commissioner of Internal Revenue,* 139 F.2d 961 (8th Cir. 1944); *see generally, Carnation Co. v. Commissioner of Internal Revenue,* 640 F.2d 1010, 1012 (9th Cir. 1981) (stating that "[i]nsurance premiums are deductible as 'ordinary and necessary business expenses.' "). No such deductions were allowed under the 1939 Code, as under the present 1954 Code, for insurance premiums paid by the non-business individual. *See*

I.R.C. § 262 (1954) and I.R.C. § 24(a)(1) (1939); Revenue Ruling 70–394, C.B. 1970–2, p. 34. The importance of this point becomes readily apparent when the taxpayer, motivated by business or financial reasons, assumes the deductible loss out of fear of a policy cancellation or a premium increase. In such instances, the economic threat posed by the insurance company's premium increase or policy cancellation upon the corporation or the business individual is not as harsh as it is upon the non-business individual. The corporation and business taxpayer will inevitably pass the increased cost on to its customers. The individual, on the other hand, is faced with a possible economic hardship if the insurance company either cancels or increases premiums.

Moreover, the government, not the business individual nor the corporation, actually pays the insurance premiums through deductions, a form of tax expenditure. *See* Surrey & McDaniel, The Tax Expenditure Concept and the Budget Reform Act of 1974, 17 B.C.Com. & Indus.L.Rev. 679, 683 (1976). Because of this subsidization and the cost transfer, the burden on these taxpayers is obviously less than the burden borne by the non-business individual.

In *Kentucky Utilities,* the holding, from this perspective, was correct on the facts of that case because had the court allowed the loss deduction to the corporation, it would have effectively left the government (other taxpayers) to pay the bill twice, once for the premium deduction, and again for the loss deduction. This is the situation that the majority advances with its holding in this case. This was not Congress's intent, nor is it consistent with the nation's tax policy. The problem with such a restrictive interpretation, however, is reconciling such a holding with the words of section 165. Thus, in the interest of statutory consistency, accepting the commissioner's result would not only be consistent with a reasonable interpretation of the Code, but also with this nation's tax policy.

Our job in interpreting statutes is to effectuate the intent of Congress. This requires us to give a practical interpretation which would not produce an absurd result. *State of Alabama ex rel. Graddick v. Tennessee Valley Auth.,* 636 F.2d 1061 (5th Cir. 1981); *United States v. Mikelberg,* 517 F.2d 246 (5th Cir.), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1104, 47 L.Ed.2d 313 (1975). Our objective is to produce an interpretation harmonious with the purpose of the statute. *Gonzalez v. Young,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *United States v. Article of Drug * * * Bacto-Unidisk,* 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), *reh'g denied,* 395 U.S. 954, 89 S.Ct. 2013, 23 L.Ed.2d 473 (1969). When interpreting tax statutes, we must exercise great care in not according to some taxpayers "double-dips" and "windfalls."

I would hold, in the interest of statutory consistency, that a taxpayer suffers a deductible casualty or theft loss only after exhaustion of all reasonable prospects of reimbursement.